STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                         )
v.                            )        20-cr-10126-ADB
                         )
PHILIP COOKE           )

### DEFENDANT PHILIP COOKE'S SENTENCING MEMORANDUM
**(Motion for Leave to File Excess Pages Granted 7/14/2021, Docket #19)**

On October 27, 2020, Phil Cooke pled guilty to one count of conspiracy to commit cyberstalking (Count 1), and one count of conspiracy to commit witness tampering (Count 2) to an Information. No charges were filed before he reached an agreement to plead, and he was not arrested. He has been on release with no issues. Under the non-binding plea agreement, the parties agreed to an advisory U.S. Guidelines calculations that result in a Total Offense Level of 21 (37 to 46 months), except the defendant reserved the right to argue that he should not receive the two-level enhancement for pattern of activity under USSG § 2A6.2(b)(1) for either victim group, which, if the Court agreed, would result in a Total Offense Level of 19 (30-37 months). That argument is set forth below.

As a result of this prosecution, Mr. Cooke has endured extensive punishment already. He lost a job he enjoyed, was devastated by the disappointment he caused his family, and was humiliated in his community – a community he honorably and faithfully served for 30 years. He has accepted full responsibility for his misconduct, is very remorseful for his bad choices, and wants to do whatever it takes to put his life right. Since accepting responsibility, he has addressed his substance abuse issue, remained sober, and successfully trained to facilitate meetings in a substance abuse program in California for both other substance abusers and also for their friends and families. He understands that this Court has multiple considerations in imposing a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C.

1

§ 3553(a).  He hopes that as a result of the factors under § 3553(a), this Court will find that a period of home confinement will satisfy those considerations.

## I.   <u>THE PATTERN OF ACTIVITY ENHANCEMENT SHOULD NOT BE APPLIED IN MR. COOKE'S CASE.</u>

The two-level enhancement for "pattern of activity" under USSG 2A6.2(b)(1)(E) should not be applied to Mr. Cooke with regards to either victim group.   Application Note 1 defines "pattern of activity" as any combination of "two or more separate *instances* of . . . harassing. . . the same victim, whether or not such conduct resulted in conviction."  Emphasis added.

The application notes do not define "instance."  The government reads this enhancement to apply to Mr. Cooke because the offense conduct at issue here involved a number of different online threatening communications and harassing deliveries to the victims—in other words, that the offense conduct in and of itself constitutes a pattern and multiple instances.  However, the First Circuit has interpreted the enhancement differently, applying it to defendants who have engaged in other instances of stalking (or other violative) conduct separate from the offense conduct, rather than multiple instances of stalking or threats forming the course of conduct itself.  *See, e.g., United States v. Robinson*, 433 F.3d 31, 36-37 (1st Cir. 2005); *United States v. Lee*, 790 F.3d 12, 18-19 (1st Cir. 2015); *United States v. Walker*, 665 F.3d 212 (1st Cir. 2011) (applying the "pattern" enhancement where the defendant was convicted of multiple counts of cyberstalking, each count emanating from a particular communication, along with a years-long history of other stalking and threatening behavior); *United States v. Fiume*, 708 F.3d 59 (1st Cir. 2013) (applying the pattern where defendant assaulted his wife in 2010, which resulted in a protective order, then violated the protective order in 2015 by sending a series of threatening communications); *see also United States v. Sayer*, 748 F.3d 425, 431 (1st Cir. 2014) (noting that the two-point enhancement was for "*long-term pattern[s]"* of stalking, threatening, or harassing behavior) (emphasis added).

The First Circuit's interpretation is logical because the statute itself requires a "course of conduct," 18 U.S.C. § 2261A, which is in turn defined as "a pattern of conduct comprised of 2 or more acts evidencing a continuity of purpose."  18 U.S.C. § 2266(2).  Under the government's interpretation, the enhancement is no different than the "course of conduct" element of the crime and would result in the application of the enhancement in every cyberstalking case.  That cannot be the purpose of an enhancement which implies an additional meaning or concern.

Here, the offense conduct was confined to a two-week time-period. Although there were multiple tweets and deliveries—all initiated by other members of the conspiracy—the entire episode is more fairly characterized as a single "pattern of conduct comprised of 2 or more acts evidencing continuity of purpose" rather than separate instances of activity or a long-term pattern. As for the part of the activity in which Mr. Cooke engaged, the white knight strategy, while multiple messages were involved, it was all part of a singular effort over a two-week period to obtain the victims cooperation to learn the identity of Fidomaster, who Baugh said was threatening CEO Devin Wenig and his family.

Application Note 3 provides that in determining whether (b)(1)(E) applies, the court shall consider "under the totality of the circumstances, any conduct that occurred prior to or during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense."  There was no "prior" conduct alleged.  To determine whether or not the "during the offense" prong should be applied to Mr. Cooke, a closer look at his conduct is warranted.  Because Mr. Cooke was not involved in the surveillance, role play, and threatening deliveries in which his co-conspirators engaged, and those acts were not reasonably foreseeable to him, that conduct should not be attributed to him personally as conduct that occurred "during the offense."

### A.     Mr. Cooke's position at eBay

At the time of events in August 2019, Mr. Cooke was Senior Manager of Security Operations for eBay's Global Security Team where he earned an annual salary of approximately $185,000.  He was hired into that position by eBay in April 2019, and he was responsible for safety at eBay's buildings in Europe, the Middle East, and Asia, as well as the global operations center in Austin, which remotely monitors all of eBay's properties.  He was the same rank as Gilbert and Popp at the time of the offense.  He had three direct reports, none of which were involved in this investigation. He did not supervise or utilize the Global Intelligence Center in this position.  He reported to Dan Cory, Director of Security Operations, who reported to Jim Baugh.

By June 2020, following the termination of Jim Baugh and Brian Gilbert, he was promoted by eBay to Director of Security Operations.  He continued to report to Dan Cory, who had been promoted to Senior Director of Safety and Security; in this position, Mr. Cooke made an annual salary of approximately $205,000.  Ex. 1 (Mr. Cooke's eBay cards from before and after his promotion).

### B.     Mr. Cooke's involvement in the cyberstalking conspiracy.

On or about August 6, 2019, Baugh informed Mr. Cooke that Fidomaster had threatened Devin Wenig and his family.  Baugh believed victims 1 and 2 had information about the identity of Fidomaster, and Mr. Cooke understood that the purpose of sending harassing Twitter messages to the victims was to make them receptive to eBay's offer of assistance, such that the victims would provide eBay with Fidomaster's identity to help the security team protect Wenig and his family.

Mr. Cooke attended a meeting on August 6, 2019, with Baugh, Popp, and Gilbert, where a plan was discussed to send harassing and anonymous Twitter messages to victim 1 so she would be more receptive to eBay's assistance, and hopefully provide eBay with the identity of

Fidomaster. 10/27/2020 Plea Transcript, at 29 (conduct that the government describes as the "white knight strategy").  The use of the @Tui Elei account was discussed.  The group also discussed using a friendly persona, one that also had been created prior to the August 6th meeting, that the victims might respond to positively.  Mr. Cooke suggested changes to a draft message that Popp showed him at the meeting to tone it down.  As for the message ultimately sent on August 7, 2019, Mr. Cooke did not view that message as threatening.  *See,* PSR Paragraph 27.

While Mr. Cooke agreed with the "white knight strategy," he did not "approve" the messages.  *See,* PSR Paragraphs 14 and 27 at FN 3. None of the co-conspirators, including Popp, reported to him or were supervised by him.  Whatever Baugh may have represented to Popp about Mr. Cooke's role, Mr. Cooke did not know or understand that he had any authority or responsibility whatsoever to "approve" any of the messages that were sent to the victims.[1]

With regard to the remainder of the activities discussed in that meeting, Mr. Cooke warned the group that they should not proceed, and agreed with Gilbert's warnings that the suggestions were ill-advised.  More specifically, with regard to the publication of the victims' address, Mr. Cooke told the group that such a practice was illegal in California.  He also told the group that in California, the messages could not be threatening, and if the victims said "stop," the messages had to stop.  When surveillance was discussed, Mr. Cooke told the group it was dangerous and that

---

[1]According to her plea agreement, Popp was a "a manager or supervisor (but not an organizer or leader)" in the cyberstalking conspiracy. *U.S. v. Stephanie Popp*, et al. 20-cr-10098-WGY (Docket #30), p. 3.  The government applied no such designation to Mr. Cooke.  Baugh was the ultimate supervisor for all of the co-conspirators; he supervised Harville, and Popp directly; he supervised Gilbert and Mr. Cooke indirectly through Dan Cory; and he supervised Stockwell and Zea indirectly through Popp.  Baugh directed and controlled all of the activities undertaken in the conspiracy (e.g. PSR Paragraphs 37, 39, 43-48, and 54); and he was the organizer and leader of all of the misconduct alleged by the government. *See*, Indictment in *U.S. v. Jim Baugh and David Harville*, et al. 20-cr-10263-PBS (Docket #33), *passim*.  Popp was Baugh's de facto Chief of Staff.  *Id.* at Para 3.  Popp was at the same level employee at eBay as Cooke and Gilbert.

they should contact a Massachusetts private investigator, and not undertake surveillance themselves.  Mr. Cooke supplied Mr. Baugh the name and contact information for a Massachusetts Private Investigator.  When deliveries of unwanted items were discussed, Mr. Cooke told the group that while deliveries might seem funny, the Postal Inspectors would not look kindly on the misuse of the mails.  He also explained that deliveries, like messages, could not be threatening.  When role play was discussed, and Mr. Cooke told the group that it was unwise, that the victims would likely call the police.  When use of a possible GPS tracking device was discussed, Mr. Cooke warned trackers were illegal in California and possibly illegal in Massachusetts and suggested contacting a Massachusetts private investigator to find out.  By the end of the meeting, Mr. Cooke believed Baugh had accepted his advice not to send threatening messages, not to do their own surveillance, not to use a tracker without first finding out if it was legal, not to use role play, not to use the mails improperly, and not to send threatening deliveries.  He also believed his long-time friend and colleague from the Santa Clara Police Department, Brian Gilbert, would keep Baugh in line.

At the time of the August 6 meeting, Mr. Cooke was scheduled to leave on August 9, 2019, for a long-planned trip to Asia, Europe and the Middle East, where he was expected to join his immediate boss, Dan Cory, to address eBay's security concerns with properties in those areas of the world.  On August 7, 2019, Baugh instructed Mr. Cooke to cancel his overseas trip and stay to help with the "operation."  Mr. Cooke defied the instruction from his boss's boss, and on August 8, 2019, left work mid-day to pack for his long-planned trip to Asia, Europe, and the Middle East.

While overseas where he was traveling alone, Mr. Cooke drank heavily. On August 20, 2019, while in India, Mr. Cooke's saw and responded to a draft Twitter message from Gilbert, to which he acquiesced with a "thumbs up emoji" and later assented to a plan to use multiple accounts

to send the message string with a "copy all." See, PSR Paragraphs 69 and 70. At the time he received the draft message set forth in PSR Paragraph 69, Mr. Cooke was unaware that his co-conspirators had attempted surveillance in Massachusetts (PSR Paragraphs 71 and 72); that Popp might have engaged in role play at the victims' house (PSR Paragraph 73); or that Baugh had directed creation of fake person-of-interest reports to conceal their activities (PSR Paragraph 74). As described in PSR Paragraph 39, Baugh directed that all deliveries, Craigslist posts, and spam was to stop Wednesday night (August 14, 2019), while Mr. Cooke was in China. According to the PSR, the last surveillance ended on August 16, 2019 (PSR Paragraph 59), also while he was in China. He was not involved in any of those activities himself, and he did not know they were being undertaken by others until after he responded to Gilbert's draft Twitter message.

Mr. Cooke often found the information he did receive incredible, not believing that Baugh would actually direct and that others participate in the activities described. Mr. Cooke regularly deleted messages from Baugh because so many of them were entirely inappropriate for the workplace and because he believed Baugh was "messing with him." In his few months at eBay, Mr. Cooke had received inappropriate and false messages from Baugh, and he had difficulty distinguishing which ones were serious.

### C.   Application of facts to pattern of activity enhancement.

While Mr. Cooke joined the plan to engage in a "white knight strategy" to send harassing and anonymous Twitter messages to soften up the victims for eBay's security team's assistance, and viewed at least some draft messages in connection with that scheme, he was not personally involved in two or more separate "instances" of harassing the same victim. His involvement is more fairly described as a single "course of conduct" or "a pattern of conduct comprised of 2 or more acts evidencing a continuity of purpose pattern of activity." The conduct took place over a

two-week period between August 7 and August 21, 2019.  While it is true that on August 21, 2019, Popp used three different Twitter accounts where one user asked for victim 1's address, and another user responded to that "guest [sic] I have to pay [victim 1] a visit," the series of messages was a single inclusive event designed to frighten the victims that an unhappy eBay seller intended to visit their home.  The use of three accounts does not change the essential singular character of this harassment, which had one purpose of setting up Gilbert's "white knight" call (PSR Paragraph 88) with the hope of uncovering the identity of Fidomaster.

Further support for this interpretation of the enhancement is set forth in Application Note 3 which provides an example of where "a defendant engaged in several acts of stalking the same victim over a period of years…."  Here, the time-period involved was limited, and all of the activities were directed to a singular purpose.  Moreover, if the surveillance and threatening deliveries are the basis for finding multiple instances, such activities were not reasonably foreseeable to Mr. Cooke who believed his co-conspirators were talked out of such misconduct at the August 6 meeting.  Because these activities were not reasonably foreseeable to him, they should not be considered conduct that occurred "prior to or during the offense" to be attributed personally to Mr. Cooke.  Other than some of the Twitter messages that comprised the "White Knight strategy," Mr. Cooke did not engage in or know about acts of harassment of the victims until after he responded to Gilbert's draft Twitter message on August 20.

If the two-level enhancement for "pattern of activity" is not applied to Mr. Cooke as regards either victim group, the Adjusted Offense Levels in Paragraph 134 and 140 will be 20, the Combined Adjusted Offense Level will be 22, and the Total Offense Level will be 19 (30 – 37 months).  If the Court follows the advisory USSG calculations of the parties, the Government agreed to recommend a six-month downward variance from the low end based on Mr. Cooke's

relative culpability, as Mr. Cooke understands it.  Para. 4.  If the Court's calculation of the advisory USSG range is lower than the parties, the government will recommend the same 30 months, despite the fact that Mr. Cooke's relative culpability does not change.  Para 4.  The defendant requests that this Court consider a downward variance from its ultimate calculation of the advisory USSG to more appropriately reflect a sentence that is sufficient, but not greater than necessary, to accomplish the goals of sentencing in connection with Mr. Cooke.

## II.   A DOWNWARD VARIANCE IS APPROPRIATE UNDER 18 USC §3553(a) FACTORS

### A.   History and Characteristics of Mr. Cooke

Prior to events in this case, Mr. Cooke led an exemplary life, one devoted to his family, friends, and community.  For decades, he was a dedicated, decorated, and hard-working public servant who made his community a safer and better place to live.  But for these crimes, Mr. Cooke has led a truly admirable life, as the many persons who speak on his behalf attest.

#### 1.   Mr. Cooke's History

Mr. Cooke is 56 years old, born in Stamford Connecticut to a first-generation immigrant Irish family, moving to Peabody Massachusetts a few years later.  On the east coast, his family enjoyed close family and friends nearby, and in Peabody, the boys played hockey and baseball, and were in cub scouts. Exhibit 2 (Letter of Eileen Cooke) at 1.   The family relocated to San Jose, California when he was 12 years old, and bought an affordable home in a neighborhood with – unbeknownst to them – significant drug and gang issues.  Mr. Cooke's mother describes the move difficult because they "knew no one and no [one] knew us, so many mistakes, from Catholic to public schools, and the neighborhood was not the best."

Out of high school in 1984, Mr. Cooke joined the Marine reserves because he believed it was the best choice. *Id.*  After six years of service, in 1990, he was honorably discharged as a

Corporal. PSR Paragraph 177.  By leaving the neighborhood, Mr. Cooke worked with colleagues and made friends with individuals who had better life plans.  He followed their lead, applied for, and accepted a job as a correctional officer in the California Department of Corrections, where he served for two years, from 1987 to 1989.  Ex. 3 (Resume) at 2.  While working in the prison, in 1988, he was commended for stopping what could have been an inmate perpetrated homicide.  PSR Paragraph 184; Ex. 4 (DOC commendation letter).  In 1989, he received an AS degree in Administrative Justice from West Valley College in Saratoga, California.  Ex. 3, at 3.

In 1989, Mr. Cooke joined the Santa Clara Police Department, where he served honorably just under 28 years, ultimately retiring as a Captain.  PSR Paragraph 182.  He was a uniformed patrol officer from 1989 to 1994; an undercover narcotics detective from 1994 to 1997 (for two of the years in undercover narcotics, Gilbert was his partner); a property crimes detective from 1997 to 1998; a persons crime detective from 1998 to 2000; and a crisis and hostage negotiator from 1997 to 2000, which was a collateral assignment.  Ex. 3 at 2.

In 2000, Mr. Cooke was promoted to Sergeant.  For the next four years, he led six to ten person patrol teams and small detective units.  He was lead detective on hundreds of investigations involving fraud, burglary, theft, sexual assaults, robberies and homicides.  Id.   Retired Captain Greg Hill of the Santa Clara Police Department provided an illuminating example of the high regard in which Mr. Cooke was held by his colleagues:

> Phil spent most of his career in our Investigations Bureau.  When we had a criminal investigation involving one of our officers, it was common for Phil to be given the investigation as the primary investigator or to assist the primary investigator.  This was due to his skill as an investigator and his relentless pursuit of the truth.

Ex. 5 (Letter from Retired Captain Greg Hill), at 1.  Mr.  Cooke was also the crisis and hostage negotiator team leader.  Officer Pablo Lopez, one of Mr. Cooke's mentees, who met Mr. Cooke on a ride-along in Police Explorer training in his senior year in high school explained:

> I recognized Phil as the person who was the Gold Standard of police officers.  Phil always had the answer on how to proceed with an investigation or a call for service, and always chose the most reasonable path to resolve matters.  Phil was so willing to help others that he became a Hostage Negotiator, and eventually, a Sergeant on the Hostage Negotiations Team.

Ex. 6 (Letter of Officer Pablo Lopez), at 1.  Officer Lopez concluded that Mr. Cooke changed his [Officer Lopez's] life (and the lives of [Officer Lopez's] future wife and children) and made the community safer for his work in the Police Department.  *Id.* at 1 and 2.  As he explained:  "Phil would take on many of the sex abuse and assault cases against children as many of the other detectives did not want to take them on."  He continued, "[w]atching Phil investigate crimes was both educating and heartbreaking.  Phil investigated crimes ranging from undercover narcotics cases, robbery and child sex crime investigations, to homicide investigations." *Id*.  Officer Lopez explained that no person "can be expected to investigate a brutal homicide of two children and go back to his own family and act like it was a normal day and work, but Phil did." *Id.*   Officer Lopez pointed out that "Phil has spoken for the victims of homicides and child sex crimes when they could not speak for themselves." *Id.*  His dedication and handling of the job impressed his oldest son, Dustin, who noted:

> I distinctly remember a ride along I had with Phil while he was working as a police officer when I was a child. There were multiple people in custody throughout the day who told me things like: "your dad is the nicest cop" or "your dad has really helped me get in the right direction." I remember being astonished that even those in custody felt admiration toward Phil.

Ex. 7 (Letter of Dustin Rothschild), at 1,

In 2004, Mr. Cooke obtained his B.S. in Business Administration from the University of Phoenix (PSR Para. 176), which he needed for any further promotion in departmental management.  After he received his BA degree in 2004, he was promoted to Lieutenant where he supervised the sergeants and oversaw various units.  He led the special response team (SWAT),

the special enforcement team, the hostage negotiations team, multiple patrol teams, the traffic unit, and the records unit.  He spoke on behalf of the department and provided training.  Ex. 3 at 2.

In 2012, he was promoted to Captain.  As Captain, he managed the Operations Division including a $30 million budget, the personnel development and management of 129 full-time employees, and managed all aspects of patrol, traffic, and the special response team (SWAT).   He also managed the Special Events Division, providing public safety at all planned special events within the city from small events to 80,000 person events at Levi's Stadium.  He also managed the Investigations Division with its $18 million budget and 52 employees which investigated person and property crimes.  He also managed undercover operations, police records, and a five-person special enforcement unit.  Id, at 1.  When he was promoted to Captain, he was nominated and selected to attend the FBI National Academy ten-week training course for police managers.  Id., at 2.

In 2016, Mr. Cooke was chosen as Incident Commander for Super Bowl 50 as someone his colleagues trusted to put in the hard work to get a difficult job done.  As Retired Captain Hill explained, "[h]e was also selected to lead the entire department when Super Bowl 50 came to our city.  We had other Captains who could have taken this on, but everyone knew he was the Captain who could make everything work (and he did)." *Id.*  For his work as Incident Commander at that event, Mr. Cooke received the California Commendation Medal from the Army General.  Ex. 8.  As his nephew, Ryan Cooke explained, "he was recognized for his planning abilities, leadership and patience in pulling together local, state, and federal law enforcement, emergency response, military, and public safety agencies." Ex. 8 (Letter from Ryan Cooke), at 1.   During the event, there were three air space violations that required action, a number of protestors, and a number of police arrests, all that were handled effectively and without incident.  Id.

Mr. Cooke retired on December 24, 2016.  Upon his retirement, he received the ASIS American Lifetime Achievement Award.  Ex. 9.

After retirement, he applied for and was approved for full industrial retirement benefits, which under the CalPers retirement program, essentially means he was awarded a full disability retirement based on service-related injuries, dated as of his original retirement date.  See, PSR Paragraph 167;  Ex. 10 (disability payment form showing approval on p. 2, to original date of retirement on p. 3); *see also* https://www.calpers.ca.gov/page/active-members/retirement-benefits/service-disability-retirement.

Mr. Cooke found retirement difficult because of the boredom and lack of purpose.  He went from intense, long hours at work where he contributed to the community every day to having nothing to do.  While he had been a heavy drinker in the evenings in the years before he retired, upon retirement, he drank much more heavily.  PSR Paragraph 172.  As explained by his wife:

> When Phil retired at the end of 2016, the amount and frequency of his consumption of alcohol increased dramatically.  He often wouldn't remember things that happened when he drank, and it was frustrating to even speak with him when he had been drinking because he wasn't understanding what I was saying.

 Ex. 11 (Letter of Deborah Rothschild), at 10.  This wife encouraged him to return to work believing that having hard work and purpose would relieve the boredom and reduce the drinking.  Id. at 10.

Accordingly, after about a year in retirement, in 2018, Mr. Cooke accepted a position as a contractor with Progressive Force Concepts in Las Vegas, Nevada as Assistant Team Leader for an Emergency Response team that was tasked with providing armed plain clothes emergency response at high-tech fortune 500 campuses in San Jose, California.  In that position, he spent time at private security jobs in Silicon Valley, including eBay.  PSR Paragraphs 180-181.  As a

result, while the job provided a place to go, a purpose, and new colleagues, it did not resolve his

drinking problem.  As his wife explained that she was wrong thinking his going back to work

would help with the drinking problem:

> I did not know about the drinking culture at eBay and Facebook.  First, he worked as a contractor for eBay which has a bar on campus where he would drink with his coworkers.  They would often leave that bar and go over to a local bar/restaurant and continue drinking until late at night.  Then he started working at Facebook where they allowed drinking during the day and would often have free alcohol available.

Ex. 11, at 10.

In April 2019, he became employed full-time at eBay, as discussed above.  In that role,

he continued to drink heavily, especially with his friends and colleagues.  As noted above, eBay

had a bar on campus that opened at 3:00 p.m., and drinking was part of the culture, with alcohol

present throughout the office space where it was typical to take morning shots of alcohol with

co-workers.  PSR Paragraph 172.  His wife explained:

> When he returned to eBay as an employee, Phil's drinking problem became even worse.  I remember one time Phil didn't come home from work until around 4am the following day.  When I asked him where he had been, he said he closed down a bar with his coworkers and slept in his car for a few hours until he felt safe to drive home.  I knew Phil and his coworkers had a liquor cabinet at work, but what I didn't know until later was they were taking shots of alcohol in the morning.

Ex. 11, at 10.

### 2.    Mr. Cooke's Characteristics

As his wife of 28 years describes, "Phil is: kind, caring, generous, considerate, dependable,

honest, hardworking, dedicated, and sincere.  He puts others needs before his own, and he has an

enormous amount of integrity.  He is a wonderful:  husband, father, son, friend, coworker,

employee, boss, and overall person." Ex. 11, at 1.  Those themes are repeated throughout the letters

of the persons who speak on behalf of Mr. Cooke.  He spent a lifetime helping others, working

long hours, performing multiple kindnesses for family and friends, and prior to this instance of incredibly bad judgment, living life well and with good purpose, serving his community and making it better place.

### a.  Hard work and devotion to duty

Mr. Cooke worked incredibly hard as a police officer for Santa Clara County.   His wife describes the long hours he devoted throughout his career, missing birthdays, anniversaries, Mother's Days, Thanksgivings, and Christmas's due to work obligations." Ex. 11, at 8.  His sister-in-law noted that even while raising three boys, Mr. Cooke took on special assignments that "required considerable risk, hours, and sleepless nights."  Ex 12 (Letter of Karen Rothschild), at 3.  When he worked undercover narcotics for three years, "he would sometimes not return home for several days without being able to call."  Id.

Mr. Cooke did not just work hard at his job.  In 1998, after working long hours, on days off, he assisted his mother taking care of his father who was fighting cancer.  Id., at 2.  In 2001, as a Detective, Mr. Cooke needed to make more money to support his growing family.   To be promoted, he needed a Bachelor's Degree, which despite his already long hours at the job, he obtained by studying nights and weekends on-line.  Id., at 4.  His sister-in-law, Karen Rothschild notes that "Phil was a very hard-working policeman, taking on many overtime hours and sleepless nights.  He would sleep with his work phone on and often be awakened in the middle of the night. He had many friends on the force and there was a deep code of loyalty between them.  He was respected by his superiors and was promoted quickly through the ranks."  Ex. 12, at 2-3.

### b.        Loyalty and kindness

In addition to his devotion to his job and the long hours worked, Mr. Cooke gave of himself to family and friends.  His loyalty and kindness are widely regarded as among his strongest qualities by those who know him best.

His mother described when Mr. Cooke was a young policeman, and his father was fighting cancer, "Phillip on his days off took care of his dad 3 days a week." Ex. 2, at 2.  The family had no bathroom downstairs, and "Philip would take his father upstairs in his wheelchair to have a shower, he wanted me to be able to keep my job in a pension company, he said it would be good for my health." *Id*.  Mr. Cooke's father died of thyroid cancer in 1991.  PSR Paragraph 159.

Mr. Cooke's older brother, Jamie, passed away in 1996 from a drug overdose.  PSR Paragraph 161.  As his mother, Eileen, explained, when Jamie passed away, it was "a very dark day in our lives," but he left a beautiful grandson, Ryan.  Ex. 2*, at 2.  Mr. Cooke "always made sure to spend time with Ryan because of the loss of his dad," and  included Ryan in the family trip to Ireland. *Id.*

Another person whom Mr. Cooke assisted through difficulties was Maurice Lawlor, his mother's second husband.  As Mr. Lawlor's daughter, Ann Lawlor Goyette, relates:

> As Dad grew older, he became mentally less agile.  He particularly loved to recite (and repeat) poetry from his school days – often at random intervals.  Phil liked to drop by Dad's house to sit with him and visit for hours at a time.  Phil shared news and listened to Dad's stories and poems.   Dad was very engaged in these conversations and looked forward to Phil's visits.  Phil was very patient and kind. He brought Dad great joy and for that, I am forever grateful.

Ex. 13 (Letter of Ann Lawlor Goyette), at 1.  Ms. Goyette went on to describe what she characterized as the greatest example of Mr. Cooke's kindness as his "extraordinary relationship with his mother." *Id.*  She explained that:

> As long as she has known him, Phil has been the foundation of Eileen's happiness and wellbeing. He is readily at her side, in good times and bad. He stops in for a cup of tea, a scone and a chat. They communicate daily and vacation together, nationally and internationally. After my dad died, Eileen moved within a few miles of Phil and his family, and she has built her world around them. *Id.*

When his sister-in-law was hospitalized during aggressive cancer treatments, she described Mr. Cooke and his wife's contributions: "Phil and his wife stepped in to help with my daughters. Phil and my sister would drive my girls around to different classes and sports training, running to the store beforehand to get them dinner and to bring to them between activities." Ex. 13, at 5.

Similarly, Mr. Cooke's considerateness and willingness to take care of others was noted by his wife, who explained that two of his mother's elderly friends had theater tickets, and "Phil was concerned with Joe driving in the dark and parking in a very crowded parking lot to come to the theater. So Phil offered to pick Mary and Joe up. He decided to pick them up with Lyft so we could be dropped off in front of the theater making it easier for Mary and Joe to walk in." Mr. Cooke and his wife have been taking them to the theater ever since. Ex. 12, at 8-9.

Local friend Carra Sunseri describes Mr. Cooke as "the first to offer help with anything, small or large." Ex. 14 (Letter of Carra Sunseri), at 1. She explains that "for years he took good care of making sure my boys and I were physically and emotionally safe and comfortable when my husband would be away for long periods for work." *Id.*

Local friend Marni Jasso explained that she admires the "bond and partnership he and his wife share." Ex. 15 (Letter of Marni Jasso), at 1. She describes it as "a special and unique partnership." *Id.* Ms. Jasso further opined that "[h]e would give the shirt off of his back for anyone in need. For the past three years, we have all attended the 'Wounded for Warriors' project fundraiser together. Philip is passionate about serving others." *Id.*

### c.      Selflessness and service

His wife, Deborah Rothschild explains, "Phil has been an incredibly positive role model for his family demonstrating the importance of service, hard work, sacrifice, dedication, and the importance of taking care of those who cannot care for themselves." Ex. 11, at 10.  While children do not always follow their parents' lead, Mr. Cooke's modeling of selflessness and service took root in his own.  As Karen Rothschild notes, "[a]ll three boys were model teenagers and have a deep devotion and respect for their parents."  Ex. 12, at 3.

Mr. Cooke's first son, Dustin, became an emergency room nurse.  Mr. Cooke met Dustin when Dustin was 2 years old, and he raised him as his own.  Karen Rothschild, Deborah's sister, saw how devoted Mr. Cooke was to her sister and her sister's young son, and observed that "this level of devotion and loyalty to a woman and her 2-year-old in a 27-year-old man was quite unusual and admirable."  Ex. 12, at 2.  Dustin was working in a Seattle emergency room as a Registered Nurse when Covid-19 hit.  He extended his travel nurse contract several times, working around the clock to help sick patients.  Ex. 11, at 11.  Dustin became very sick with Covid himself, but did not tell his family until he was better because he did not want to worry them.  *Id.*  When he recovered, he returned to work, and donated plasma to help others. *Id.;  See also,* Ex. 7.

Mr. Cooke's second son, Shea, joined the Army after high school.  Shea focused on his father's selflessness and concern for Shea when Mr. Cooke described this case and its possible consequences to Shea.  Shea noted that his father's "primary concern was not that he would be going to prison for a number of years.  Instead, he was primarily concerned about how this will impact me [because of Shea's security clearance and the background investigations required]." Ex. 16 (Letter of Shea Cooke), at 1.  Shea continued, "I realize that I should not have been surprised at how selfless he was being.  As long as I have known him, I have never once seen my father put

himself in front of others." *Id.*  Shea went on to describe how when the stress from a deployment in a rural outpost in Syria nearly brought him to the breaking point, he thought about how strong his father was over a lifetime as a police officer, and found the strength to make it through those first six months in Syria.  *Id.*  at 1-2.  Shea left for a second tour of duty in November 2020.

Mr. Cooke's third son, Evan, is still a college student.  Evan has been accepted and is transferring to UC Santa Barbara as a Junior, majoring in finance, this September after completing his first two years at De Anza Junior College.  This incident has been hard on Evan, and Evan still has trouble speaking about the incident and its impact on himself and his family.

His wife even attributes her own focus on caring for others in part to Mr. Cooke's modeling, as well as his support and inspiration, particularly with regard to shifting her career from physical fitness generally to working with seniors and those dealing with cancer, osteoarthritis, joint replacement, as well as stroke survivors.  Ex. 11, at 11.

### 3.    Health Issues

As his wife explained, "[b]ecause he puts others needs before his own, Phil doesn't take care of himself."  His sister-in-law described the physical harm he suffered to himself while taking care of others in the line of duty.  One of the injuries was incurred when Mr. Cooke climbed a two-story building with his arms where the escape ladders were locked.  A dangerous suspect was heading to the roof where his officers were located, so he scaled the building to try to help protect them.  This effort caused considerable damage to his shoulder, which resulted in an extensive surgery and recovery.  Ex. 11, at 4.

In April 2013, his wife noted that Mr. Cooke was obviously sick but refused to take time off to go to the doctor.  Ex. 11, at 6.  His wife finally took him herself.  *Id.*  As soon as the doctor examined him, she called 911.  *Id.*  The emergency room physician noted that if Mr. Cooke had

been brought in even a few minutes later, he would have died.  *Id.*  That led to nearly a year of "hospital stays, 911 calls, emergency room visits, time in ICU, and a long recovery which left his heart and lungs permanently damaged."  *Id.*  As Karen Rothschild summed up, Mr. Cooke ended up "with a very serious case of pericarditis which required emergency heart surgery and caused permanent damage to his heart."  Ex. 12, at 3.

Since the heart injury, Mr. Cooke continues to suffer from occasional uncontrolled increases in heart rate that result in dangerous arrythmias, that in the past have been life threatening.  Ex. 11, at 6.  He is prescribed Tenormin which, if taken daily, generally controls the increased heart rate.  Some days he needs access on an as-needed basis to an additional dose if the single daily dose doesn't sufficiently control his heart rate.  PSR Paragraph 168.  Whether and to what extent any BOP facility to which Mr. Cooke is assigned can timely respond to Mr. Cooke's heart issues is not now known, but timely access to the important medication as needed is critical for Mr. Cooke.

Since June 2020, when he agreed to plead, Mr. Cooke has seen a court-ordered therapist as part of his pre-trial release.  Through that work, he ultimately appreciated and accepted that he is an alcoholic, recognized that boredom and lack of purpose are triggers for him, and has become and remained sober.   His wife attests that he has not been drunk since June 2020.  Ex. 11, at 10. Through therapy and to address his need for meaningful activity, Mr. Cooke completed an addiction recovery training program in California where he both attends and facilitates multiple weekly meetings for substance abusers, and also trained to facilitate meetings for the friends and families of substance abusers.  See, Ex. 17 and 18 (certificates of completion of training).

**B.      Nature and Circumstances of the Offense.**

**1.      Cyberstalking conspiracy**

While the cyberstalking crime itself is serious, Mr. Cooke's participation in the conspiracy was limited.  He did not obey Baugh's instruction to stay in the United States and assist.  He did not travel to Boston to conduct surveillance or make deliveries or engage in role play, and he did not know that his co-conspirators had done so before August 20, 2019, when he was in India.  On August 20, 2019, he responded to Gilbert's message regarding sending a series of anonymous and harassing Twitter messages designed to obtain the victims cooperation in identifying Fidomaster, whom Baugh had described to him as personally threatening CEO Devin Wenig and his family. At that time, the other activities directed by Baugh including surveillance, role play, and threatening deliveries were not reasonably foreseeable to Mr. Cooke because he thought Baugh had been persuaded not to engage in these more threatening behaviors at the August 6 meeting.

Under the circumstances, the USSG calculation overstates the seriousness of the offense for Mr. Cooke where a single course of conduct was involved that impacted two victims, as opposed to injuring two victims in entirely different episodes.  *See,* United *States v. Hernandez Coplin*, 24 F.3d 312, 319 n.7 (1st Cir. 1994)(finding the Guidelines overstated the seriousness of an offense by requiring separate groups for each victim, explaining that harm to two victims in one course of conduct is "less culpable than injuring two victims in two entirely different episodes."  A similar type of analysis was undertaken by the First Circuit in *United States v. Montijo-Maysonet*, 974 F.3d 34, 53–54 (1st Cir. 2020), where the First Circuit distinguished between an agreement to commit the same crime or the use of mails and wires sent to further the same scam, and Montijo's two trips to the motel with an underage victim to expose her to two different sexually-charged encounters — away from familiar surroundings — to which she couldn't legally consent.

21

Likewise, in *United States v. Nedd*, 262 F.3d 85 (1st Cir. 2001), the court addressed an interstate threats and interstate violation of a restraining order case involving multiple victims. There, the defendant made multiple threats targeting the same individual, but each threat (except one) also named a different one of the primary victim's family members as well. Id. at 92-93. Nonetheless, in *Nedd*, the First Circuit analyzed which counts involved the same conduct and same group of victims. Id.

To be clear, Mr. Cooke agrees that the grouping rules under Application Note 8 of USSG § 3D1.2 envision two different groups, one for each victim (*see, e.g., United States v. Vasco*, 564 F.3d 12, 23 (1st Cir. 2009)), but he believes that in this case, where his participation was limited and the same course of conduct impacted two victims, the resulting USSG calculation overstates the seriousness of the offense for him.  Even though the offense conduct resulted in "independent, personal, and deeply traumatic effects" to two separate victims (see *Nedd* at 92), the Twitter messages were sent to further a single course of conduct designed to ultimately obtain the identity of Fidomaster.

### 2.    Witness Tampering Conspiracy.

Regarding the conspiracy to commit witness tampering, Mr. Cooke was worried for his friends and colleagues, and particularly Gilbert, who had been a close friend and colleague for more than 25 years in the Santa Clara Police Department and who had been his partner in undercover narcotics for two years.  He did not want his friends to get in trouble.  He is utterly remorseful for this conduct.  Although it is no excuse, in the August 20-22 time period, when the witness tampering occurred, Mr. Cooke was in India alone and inebriated.  As a result of being drunk, Mr. Cooke did not fully comprehend the extent of the misconduct toward the victims and his judgment was impaired; he found it nearly impossible to believe after prior discussions that

his friends and colleagues could or would engage engaged in surveillance, role play, and threatening deliveries that he learned may have happened.  He is utterly remorseful for his involvement in misleading the Natick police.  He knew better.  It was inconsistent with everything he stood for as a police officer for decades.

Although it is of no solace to him at this time, it is significant that Mr. Cooke did not compound that mistake by lying to eBay investigators.  As specifically noted at the plea hearing by the prosecutor, Mr. Cooke did not lie to eBay. 10/27/19 Plea Transcript, at 28.  As described in PSR Paragraphs 108-122, Mr. Cooke was not involved in the scheme to conceal information from eBay investigators and their outside counsel.

**C.      Need for the Sentence Imposed.**

Mr. Cooke recognizes that among other factors, this Court will consider incarceration to promote respect for the law and to provide just punishment for the offense, as set forth in 18 U.S.C. § 3553(a)(2)(A).  Given Mr. Cooke's lack of any criminal history, the Bureau of Prisons will likely assign him to serve any period of incarceration imposed at a minimum-security prison.  However, even those who have been so assigned are required to quarantine, sometimes for two weeks in solitary confinement, before entering the prison population.  That time can be extended if a prisoner is inadvertently exposed to another incoming inmate or person who may have been exposed.  Additionally, because of COVID-19, the circumstances of imprisonment are more severe than incarceration in the past, with less ability for prisoners to engage in teaching, classes, recreation, or other more communal pursuits.  As a result, a period of incarceration is harsher than in the past, and those difficult conditions should inform what type of sentence is necessary to provide just punishment and provide respect for the law.

As to general deterrence under § 3553(a)(2)(B), the risk of imprisonment—as opposed to the length of time in prison—deters others.  The eBay matter has received intense media coverage, particularly in California where eBay is located and where Mr. Cooke lives.  A bright spotlight has been shined on all participants, but has particularly impacted those who lived and worked in Santa Clara County their entire adult lives.  An unequivocal message has been sent to the public through this press:  it is against the law to use the internet to harass with the intent to cause substantial emotional distress, and certainly to lie to the police.

With regard to the need to protect the public from further crimes of Mr. Cooke, § 3553(a)(2)(C), there is no need for any prison sentence at all.  Mr. Cooke is no longer employed at eBay, and it is improbable that he will ever be employed in private security again.  Importantly, the traumatic experience of this prosecution to Mr. Cooke and his family assure that he will not commit another criminal act, even in a misguided attempt to protect others.  Mr. Cooke has dedicated this past year to changing and improving his life – addressing his substance abuse issue, finding purpose through his volunteer work, and recommitting to the quality of life he lived before events in this case.  He views these changes as vital to himself, his family, and his community.

Finally, under § 3553(a)(2)(D), Mr. Cooke is unaware of any necessary educational or vocational training, medical care, or correctional treatment that could be more effectively provided in an institutional setting; U.S. Probation has identified him as a potential candidate for the Residential Drug Abuse Program by the Bureau of Prisons.  Of note, his completion of the training for a substance abuse program in California, including his participation both as a participant and as a facilitator for others, to which he is committed to continuing, provides an effective means of dealing with his substance abuse problem.

### D. Avoiding Unwarranted Sentencing Disparities -- Relative Culpability.

Mr. Cooke is the first defendant in this crime to be sentenced, there are no other sentences currently imposed. Four other defendants have been convicted (Gilbert, Popp, Stockwell and Zea); two defendants have been indicted (Baugh and Harville). Accordingly, an examination of what the government has said it intends to recommend based on what others did is illuminating.

As indicated above, the Government agreed to a six-month downward variance for Mr. Cooke from the USSG calculations as agreed by the parties based on, as Mr. Cooke understands it, his relative culpability. Under the Plea Agreement, the recommendation for a downward variance disappears if the Court calculates the USSG lower than the parties. While under the Plea Agreement, the government will recommend 30 months no matter what the Court ultimately determines the advisory USSG calculation to be, the facts about Mr. Cooke's involvement in the activities relative to others and his history and characteristics do not change.

Without question, Baugh was the ringleader of the misconduct, directing others to carry out his plans – whether travel to Boston, surveillance, role play, deliveries of unwanted items, or threatening mailings, all as set forth in the Indictment. He supervised Popp and Harville directly, and all of the other participants indirectly. He has not been convicted at this time.

According to the government's charges, Harville travelled to Massachusetts to participate in the surveillance activity and attempt to install a tracker on the victims' car. *U.S. v. Jim Baugh and David Harville*, et al. 20-cr-10263-PBS (Docket #33), Para. 16w, z, aa, bb, and ff-ii. He has also not been convicted at this time.

Popp was Baugh's de-facto Chief of Staff, and she supervised the younger women who arranged unwanted and sometimes disturbing deliveries, misused the mails, and participated in surveillance activities. She pled guilty last fall. In her plea agreement, the government calculates

her TOL at 24 (51 to 63 months) based upon her supervisory role, but has agreed to recommend 41 months (a ten-month reduction from the low end of the advisory USSG). *U.S. v. Brian Gilbert*, et al. 20-cr-10098-WGY (Docket #30; Popp Plea Agreement), p. 3. Popp was the same level employee at eBay as Gilbert and Mr. Cooke. Popp was deeply involved in the underlying events and was directly and personally involved in many of the activities that are the focus of this prosecution at the direct instructions of Baugh. *U.S. v. Brian Gilbert*, et al. 20-cr-10098-WGY (Docket #1; Information), *passim;* (Docket #27 -- Plea Transcript; government statement of facts for Popp), pp. 36-38. She participated in key meetings including a meeting on August 6 regarding the white knight strategy, a meeting on August 6 regarding the delivery of unwanted and disturbing items to the victims' home, and a meeting on August 14 regarding surveillance and installation of a GPS tracker. Indictment in *U.S. v. Jim Baugh and David Harville*, et al. 20-cr-10263-PBS (Docket #33), Paragraph 16a, b, and w. She personally sent the Tweets to the victims. *Id*, Paragraph 16, *passim*. She personally travelled to Boston to replace Harville on the surveillance team. *Id.*, Paragraph 16mm and qq.

The two younger women, Zea and Stockwell, both of whom have pled guilty and both of whom reported to Popp, were members of the Global Intelligence Center, acting based upon the express instructions of Baugh. *U.S. v. Brian Gilbert*, et al. 20-cr-10098-WGY (Docket #27 – Plea Transcript; government statement of facts for Zea), pp. 35-36. The government assigned them TOL 19 (30-37 months) based on a minor role reduction, with an agreement to recommend 30 months for Zea and 24 months for Stockwell. *U.S. v. Brian Gilbert*, et al. 20-cr-10098-WGY (Docket #33 – Zea Plea Agreement; Docket #43 – Stockwell Plea Agreement).

Gilbert also pled guilty. His TOL, like Mr. Cooke's is 21 (37 to 46 months), and the government indicates it will seek a 37-month sentence. *U.S. v. Brian Gilbert*, et al. 20-cr-10098-

WGY (Docket #42 – Gilbert Plea Agreement), at 3.  Like the other defendants in his case, Gilbert operated under Baugh's direction; however, unlike Mr. Cooke, Gilbert was on the ground in Massachusetts, handling interactions with the Natick Police Department, and involved directly with at least some of the other co-conspirators in real time, according to his Information (Docket #1).  However, because of the significant extent to which Baugh siloed information about the inappropriate activities he was directing, Gilbert also may have been unaware of the full scope of the misconduct, including some of the activities he and Mr. Cooke warned against at the August 6 meeting.

<u>**CONCLUSION**</u>

Mr. Cooke respectfully requests that he be sentenced to home confinement for whatever period the Court believes is necessary, 12 months supervised release, a $200 special assessment, no restitution (as none has been requested), and no fine.  He requests the Court to find that no fine is warranted because his wife's income will be insufficient to pay his family's living expenses and she will need his pension for the family's expenses.  He believes that such a sentence would be sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth in § 3553(a).

Respectfully submitted,

*/s/ Susan G. Winkler*
Susan G. Winkler  (BBO #530682)
Winkler Law LLC
120 Holmes Street, Suite 313
Quincy, MA 02171
(617) 642-6671
Winkler.susan@gmail.com

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>*/s/ Susan G. Winkler*</u>

July 20, 2021                                         Susan G. Winkler