UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 20-CR-10126-ADB |
| | ) | |
| PHILIP COOKE | ) | |
| | ) | |
| Defendant | ) | |

<u>SENTENCING MEMORANDUM OF THE UNITED STATES</u>

*"The attacks were meant to scare us, and they did - we were terrified." - Victim 1*

*"A stack of baking sheets was leaning against our back door so that we could hear anyone trying to break into our home. ... That day was our 31st wedding anniversary." - Victim 2*

From a suite of offices in Silicon Valley, defendant Philip Cooke and his coconspirators—all employees or contractors of eBay, Inc.—unleashed the resources of a Fortune 500 company on a Natick couple, whose journalism had angered two of the company's senior executives. A three-week nightmare followed: anonymous and profane demands that the couple stop reporting about eBay; the publication of their home address on Twitter and threats to visit them there; the delivery of live insects and a funeral wreath; Craigslist posts inviting all comers to sexual encounters at their home; a black van that followed the husband as he drove around Natick, and so much more.

As a retired police captain with 27 years' service, Cooke should have appreciated the impact a fraction of this conduct would have on the victims. Instead, he agreed to harass them online in service of a corporate objective. Cooke then committed a second crime when he interfered with the police investigation that followed, obstructing officers whom he would have called colleagues only years earlier.

The Probation Office correctly calculates Cooke's offense level at 21 (¶ 148) and his

1

Criminal History Category at I (¶ 152), with a resulting Guidelines Sentencing Range of 37 to 46 months (¶ 191).  For the trauma he caused the victims, for his betrayal of the idea behind the badge he once wore, and for the reasons stated below, the United States respectfully requests that the Court sentence Cooke to concurrent sentences of 30 months' imprisonment on each count of the Information, 3 years' supervised release, a $15,000 fine, and a $200 special assessment.

## BACKGROUND[1]

In August 2019, Cooke was 54 years old, serving as a Senior Manager on eBay's Global Security Team.  (¶ 7(g)).  eBay paid him $185,000 per year, on top of an annual $214,800 pension from his police career.  (¶¶ 7(g), 178).  Both Cooke and his friend Brian Gilbert, another former Santa Clara police captain, reported through an eBay director to Jim Baugh, eBay's top security executive.  (¶¶ 7(f), (g)).

For approximately 20 years, Victim 1 had been a reporter and editor of an online newsletter that covered eBay and other ecommerce businesses ("the Newsletter").  Her husband, Victim 2, was the Newsletter's publisher.  The Victims lived in Natick.  (¶¶ 8, 9).

On August 1, 2019, after the Newsletter published an article about a lawsuit between eBay and Amazon, eBay's CEO (Executive 1) messaged the company's Chief Communications Officer (Executive 2) regarding Victim 1:  "if we are ever going to take her down..now is the time."  Executive 2 shared the CEO's text with Baugh, who asked, "Let me ask you this, do we need her entire site shut down?  I'm not fucking around with her[] anymore."  Executive 2 replied, "Amen. I want her DONE."  Baugh asked if the CEO "said to burn her to the ground

---

[1]The Presentence Investigation Report ("PSR") sets forth the conspiracies' scope in greater detail.  This section necessarily focuses on Cooke's conduct.  All "¶" references are to the PSR.

correct?," to which Executive 2 replied, "She is a biased troll who needs to get BURNED DOWN."  Baugh continued, "If I can neutralize her website in two weeks or less, does that work for you," to which Executive 2 replied, "I want to see ashes.  As long as it takes.  Whatever it takes".  (¶ 21).

On August 6, 2019, Cooke attended a meeting at eBay's headquarters with Baugh, Gilbert, and Stephanie Popp, a senior security manager who served as Baugh's chief-of-staff.  Baugh showed some of Executive 1 and Executive 2's text messages to the group.  Baugh, Gilbert, Cooke, and Popp then planned to send Victim 1 a series of increasingly hostile messages over Twitter that would culminate in the doxing of the Victims (*i.e.*, the publication of the Victims' address and other personal information over the internet).  Gilbert would then contact Victim 1 to offer help with the harassment, to earn the Victims' good will and their assistance in identifying "Fidomaster," an online persona who criticized eBay and its executives.  (The government has termed this strategy, of having Gilbert arrive to assist with harassment that eBay itself was responsible for, the "White Knight Strategy").  (¶ 22).

On the day of the meeting, Popp created a Twitter account ("the @Tui_Elei Account") that featured a profile picture of a skeleton mask, which was intended to scare the Victims.  (¶ 25).  Baugh directed the timing of the messages and tweets.  Gilbert drafted and shared them over a WhatsApp message group that included Popp, Gilbert, Baugh, and Cooke, sometimes receiving input in response.  Popp then sent the messages.  (¶ 27 n.3).

At the August 6 meeting, Cooke and the others also discussed sending packages to the Victims' home, role play as a way of alarming Victim 1, surveillance of the Victims, and the use

of a GPS device, although Cooke claims that he left the August 6 meeting believing these things would not take place.  (¶ 22, *Def. Mem.* at 5-6).[2]

On August 7, the day after the White Knight Strategy meeting, Baugh forwarded to Popp, Gilbert, and Cooke an email in which Executive 2 complained about both Fidomaster—the online critic—and Victim 1.   The email noted that Fidomaster and Victim 1 were "infatuated with eBay" and "have seemingly dedicated their lives to erroneously trashing us as a way to build their own brand – or even build a business."  Executive 2 continued, "This issue gives me ulcers, harms employee morale, and trickles into everything about our brand.  I genuinely believe these people are acting out of malice and ANYTHING we can do to solve it should be explored.  Somewhere, at some point, someone chose to let this slide.  It has grown to a point that is absolutely unacceptable.  It's the 'blind eye toward graffiti that turns into mayhem' syndrome and I'm sick about it.  Whatever.  It.  Takes."  (¶ 26).

Cooke claims that Baugh told him that Fidomaster had threatened eBay's CEO, *Def. Mem.* at 4, but the messages and email Baugh shared concerned Victim 1 and Fidomaster's perceived criticism of eBay (*i.e.*, "she is a biased troll"; "dedicated their lives to erroneously trashing us as a way to build their own brand").   Many of the harassing messages that followed also took issue with the Newsletter's reporting.  On August 6, the first message asked, "[Victim

---

[2] On August 6, Baugh convened a second meeting in eBay's Global Intelligence Center ("GIC")—an intelligence and analytics group inside eBay that supported the security department's work—with coconspirators Popp, Veronica Zea, and Stephanie Stockwell, and three GIC analysts.  Baugh again showed some of Executive 1 and Executive 2's messages regarding Victim 1 and the Newsletter.  He tasked this group—Cooke was not present—with the delivery to the Victims' home of unwanted and disturbing items, to distract the Victims from publishing the Newsletter.  To demonstrate the idea of his "distraction campaign," Baugh played for the group an excerpt from the movie *Johnny B. Good*, which showed a series of harassing deliveries to a couple's home.  (¶ 23).

1]…whats your problem w/ebay?   You know that's how we pay rent." (¶ 27).   An August 12 message threatened, "many familys including mine make money 2 pay 4 food cloths and rent by selling on ebay…UR stupid idkiot comments r pushin buyers away from ebay and hurtin familys!!! STOP IT NOW!!" (¶ 42).   Other messages, including ones from August 10, were simply vulgar:   "Ur fat fuck pussy husband [Victim 2's first name] needs to put u in line cunt" / "after he takes the plugs out of his asshole…fuckin pussies!!!"   (¶ 36).

On August 8, Cooke left on a business trip to Asia, Europe, and the Middle East.  *Def. Mem.* at 6.   The harassing and threatening messages continued as planned, however, including one in which the group posted the Victims' address (as discussed in the August 6 meeting). (¶ 64).   Real world harassment and deliveries began as well:   a phone call responding to Victim 2's purported interest in a sex toys franchise (¶ 29); a funeral wreath (¶ 43), a book on surviving the loss of a spouse (¶ 40); a frightening pig mask (¶ 34); pornography addressed in Victim 2's name to the Victims' neighbors (¶ 32), and on and on.

Beginning on August 11, Baugh recruited one of his reports, David Harville, to travel with him and Zea to Boston to surveil the Victims in their home and community.   Baugh shared with Harville the executives' text messages and emails, noting he had been "ordered to find and destroy".   (¶¶ 37-38).   After flying to Boston, Baugh and Harville attempted to break into the Victims' garage to install a GPS on their car (¶ 55), and Baugh and Zea—once with Harville and once with Popp—followed Victim 2 in his car as he drove through Natick.   (¶¶ 58, 67).

*The WhatsApp Thread*

During the course of its investigation, the government discovered a series of WhatsApp messages covering the period between August 20 and August 22 that included Popp, Baugh,

5

Gilbert, and Cooke ("the WhatsApp Thread").   The WhatsApp Thread revealed that Cooke had done more than simply attend the White Knight Strategy meeting before leaving on his trip.   In relevant part, it:

- Corroborated Popp's account of the existence of a WhatsApp group to vet the harassing content directed to the Victims, including a pair of messages that Gilbert proposed to the group (¶¶ 69, 70).

- Showed Cooke responding from abroad ("Copy all") within minutes of Gilbert proposing a series of messages to Victim 1:   "When she doesn't respond, then this, 'What the fuck?!?!   Hey what was [Victim 1's] home address again?   I guess I have to pay her a visit".   Gilbert proposed that Popp could then post the Victims' home address "again", setting up Gilbert's contact as the White Knight (¶ 70).

- Included a recording of a Natick Police Department ("NPD") dispatch call about Baugh's surveillance of Victim 2, with Cooke replying "Copy all. Best of luck Brian" (¶ 71).

- Contained messages from Baugh detailing his surveillance efforts and the suggestion that people had been approaching the Victims at their home "for the past five nights", to which Cooke replied "Hahaha" (¶¶ 72-73).

The WhatsApp Thread also showed that Cooke learned about the NPD's investigation on the morning of August 21—within eight minutes of Baugh messaging the group that an NPD detective was in the lobby of Boston's Ritz Carlton looking for Zea.   (¶¶ 78-79).   Even from halfway around the world, Cooke participated substantively in a plan to interfere with the NPD's investigation.   As the group discussed a meeting that Gilbert would have with the NPD the next day, Cooke commented about the NPD's interest in the gift cards that had been used to purchase harassing deliveries:

> Brian, important to be convincing so they don't start looking to find video of who purchased the gift cards.   Don't think they would go that far but is a little concerning.   If I was the Detective I would ask you for a local PD [contact] to go get video.   Might want to have a friendly in mind."

6

When Gilbert suggested providing surveillance video from the wrong supermarket, Cooke responded with two "thumbs up" emojis.  (¶ 102).

As the group planned Gilbert's response to any question about who Zea's supervisor was, Cooke weighed in that it was a "good idea" to name a coconspirator, Popp, rather than Zea's actual supervisor, who was not a coconspirator.  (¶ 103).

Finally, when Baugh asked Cooke, Gilbert, and Popp, whether they should still try to put a GPS tracker on the Victims' car, Gilbert proposed delaying:  "They couldn't be more on guard than right now.  If we can calm them down and win them over maybe.  Right now I would not risk an attempt."  Cooke responded, not with an objection to the group's use of a GPS device on the Victims' car at all, but simply by agreeing with Gilbert:  "Agree with Brian.  Was typing the same thing".  (¶ 104).

On August 26, having returned to eBay headquarters as the investigation unfolded, Baugh, Harville, Gilbert, Popp, and Zea met, discussed the NPD investigation, and deleted and attempted to delete from their cell phones evidence of what they had done and their efforts to impede the investigation, including WhatsApp messages.  (¶ 114).  Cooke remained abroad.

In September 2019, eBay suspended and then fired Executive 2, Baugh, Popp, Zea, Harville, and Stockwell.  eBay took an image of Cooke's iPhone, but the image did not include the WhatsApp Thread or any messages regarding the harassment.  It is not clear when in relation to these events Cooke deleted them.  Cooke accepted a promotion from eBay—filling the shoes of his supervisor who was promoted to replace Baugh—and a $20,000 raise.  (¶ 7(g)).  The government revealed the existence of the WhatsApp Thread, naming Cooke as "Supervisor 1" when it charged six coconspirators in June 2020.  eBay fired Cooke shortly thereafter.

## GUIDELINES CALCULATION

The Probation Office correctly increased Cooke's offense level by two under U.S.S.G. § 2A6.2(b)(1)(E).   That enhancement applies "(1) If the offense involved one of the following aggravating factors: … (E) a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim."

Application Note 1 to § 2A6.2 defines a "pattern of activity" as:

> any combination of two or more separate instances of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction.   For example, a single instance of stalking *accompanied by* a separate instance of threatening, harassing, or assaulting the same victim constitutes a pattern of activity for purposes of this guideline.

(emphasis supplied).   Application Note 3 to § 2A6.2 makes clear that in determining whether subsection (b)(1)(E) applies, the court must consider, "under the totality of the circumstances, any conduct that occurred … during the offense".[3]

Here, the conduct that occurred "during the offense" included at least seven different categories of conduct across approximately three weeks:   (1) threatening tweets and Twitter direct messages; (2) signing the Victims up for unwanted online subscriptions; (3) twice publishing the Victims' home address; (4) online advertising of yard sales, parties, and sexual encounters at the Victims' home; (5) harassing deliveries; (6) an attempt to install a GPS device on the Victims' car while it was locked in their garage; and (7) two separate instances of surveillance that the Victims experienced.   These at least constitute, in the words of Application Note 1, instances of threatening and harassing "accompanied by" separate instances of stalking.

---

[3] Although not relevant to Cooke, it must also consider any conduct that occurred "prior to the offense" that is "substantially and directly connected to the offense."

Cooke's suggestion that he agreed at the August 6 meeting only to a series of harassing messages (and to no other conduct) does not help his position. As an initial matter, the First Circuit held in *United States v. Lee* that "a series of [threatening] emails through the Spring of 2012" was "enough to sustain the pattern-of-activity enhancement." 790 F.3d 12, 19 (1st Cir. 2015). *Lee* refused to reach the question of whether older incidents of physical abuse could be considered as part of the pattern "because the more recent emails suffice". 790 F.3d at 19 n.3; *see also United States v. Lloyd*, 809 Fed App'x, 750 (11th Cir. 2020) (two extortionate threats to publish photos of the victim warranted a pattern-of-activity enhancement). Here, Cooke agreed to a plan to send a series of harassing messages and tweets to Victim 1 (¶ 22), and then, in writing on August 20, agreed to the publication of tweets from several anonymous accounts that threatened Victim 1 not to publish about eBay, posted the Victims' home address, and suggested that one of her anonymous messengers might have to "pay [Victim 1] a visit." (¶¶ 69-70).[4] Cooke's argument that this series of threats, harassment, and doxing is not "separate instances of activity" because it took place over weeks with the same basic purpose (*Def. Mem.* at 3) is inconsistent with both *Lee* and the language of Application Note 1, which speaks to instances that "accompany" each other. It would also counterintuitively protect sophisticated defendants who harassed, threatened, and stalked at the same time to terrorize their victims.

Nor does the pattern-of-activity enhancement impermissibly double count the "course of conduct" element already present in 18 U.S.C. § 2261A. *Def. Mem.* at 3. *See United States v. Fiume*, 708 F.3d 59, 60 (1st Cir. 2013) ("We hold that the use in tandem of a base offense level

---

[4]The remaining cases that Cooke cites predate *Lee*. That these cases found patterns of activity based on more extensive conduct does not foreclose the enhancement's application here.

dictated by §2A6.2(a), and an upward adjustment under § 2A6.2(b)(1)(A), does not constitute impermissible double counting"). In *Fiume*, a defendant subject to a no-contact order attempted to communicate with his estranged wife by telephone, mail, e-mail, text, message, Facebook, and through a message left on a tree at the wife's childhood home. *Fiume*, 708 F.3d at 60-61. The defendant received two, 2-level enhancements, both for violating a court order (§ 2A6.2(b)(1)(A)) and for his "pattern of activity" (§ 2A6.2(b)(1)(E)). The First Circuit rejected his argument that the sentencing court used his violation of a court order twice,[5] finding that: (1) § 2A6.2 and its associated commentary, "the most helpful aid in the task of separating permissible double counting from its impermissible counterpart," did not forbid it; and (2) § 2A6.2 targeted three separate crimes under the rubric of "Stalking or Domestic Violence". Where only one of those three statutes contained as an element the violation of a protection order, the "most logical conclusion is that the defendant's base offense level accounts for the general nature of the offense of conviction as one of stalking or domestic violence, but does not account specifically for the violation of a court protection order." *Id.* at 62. *Fiume* controls here, as the Sentencing Commission is not shy about proscribing double counting when it means to, and only one of the three statutes referenced to § 2A6.2 contains a "course of conduct" element. *See id.*

A district court in South Dakota reached the same result on the same reasoning in *United States v. Ogden*, rejecting both a defendant's argument that eight Craigslist posts over five weeks inviting men to the victim's home for sex was "one incident of stalking", as Cooke suggests here,

---

[5] The Defendant did not challenge the imposition of the "pattern of activity" enhancement based on his series of attempts to contact her. .

10

and that his claim that a "pattern of activity" enhancement impermissibly double-counted. *United States v. Ogden*, 4:16-cr-40082-KES (D.S.D. April 25, 2017) (Sent. Tr. at 1-7, Exh. A hereto), *aff'd on other grounds*, 725 Fed. App'x 421 (8th Cir. 2017).

Even if the harassing and threatening Twitter messages were the extent of Cooke's role, however, the pattern-of-activity enhancement is tied to what the "offense involved", not the defendant's own conduct. § 2A6.2(b)(1). As noted above, the offense involved harassing and threatening messages, harassing and threatening deliveries, and GPS and physical surveillance, all of which terrified the Victims. In the case of "jointly undertaken criminal activity," Cooke is responsible for "acts and omissions of others" that are within the scope and in furtherance of the conspiracy, and "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

The fact that Cooke attended a meeting at which he, Popp, Gilbert, and Baugh discussed the finer points of surveillance, GPS devices, doxing, role play, and harassing deliveries in the context of the White Knight Strategy—all things that came to pass within hours and days of the August 6 meeting—suggests that what happened *was* reasonably foreseeable. (*Def. Mem.* at 5-6). That Cooke felt it necessary to draw lines between "acceptable" and "unacceptable" forms of harassment only reinforces this conclusion. Cooke's directions, for example, that harassment would have to stop if the Victims complained; that mailed deliveries of unwanted items posed risk to the group; or that it would be somehow appropriate to see if a Massachusetts private investigator would install a GPS device in service of the White Knight Strategy all made what happened next more foreseeable, not less. Cooke's leaving such a meeting convinced that things would go as planned is unpersuasive. *See United States v. Molina*, 106 F.3d 1118, 1121

11

(2d Cir. 1997) (finding the discharge of weapons at an armed robbery foreseeable despite defendant's absence from the scene and a prior agreement that weapons would be carried but not fired); *see also United States v. Acevedo*, 824 F.3d 179, 185 (1st Cir. 2016) (holding that a ransom demand was foreseeable, despite the defendant's belief to the contrary, during the course of a kidnapping that "had the marks of one done for gain").

By August 20, in any event, it was crystal clear that Cooke was involved in an agreement that encompassed a variety of harassment, stalking, and threats. The WhatsApp Thread made Cooke aware of demands that Victim 1 stop publishing about eBay (¶ 70); the surveillance of the Victims and its effect on them (¶¶ 71-72); the arrival of uninvited visitors to the Victims' home (¶ 73); that Baugh intended to make the Victims look "crazy" to the NPD (¶¶ 81); the fact that the Victims were "totally rattled" by the White Knight Strategy (¶ 89); and that there had been unsolicited deliveries to the Victims' home (¶ 91).

Despite clear signs in the WhatsApp Thread that what was once reasonably foreseeable had now come to pass, Cooke expressed no surprise, alarm, or objection. Not only did Cooke not immediately withdraw from the conspiracy, he endorsed the continuation of the White Knight Strategy, even though it now plainly included a pattern of activity:

> Gilbert: I spoke with investigator. He was polite and clueless.
>
> Cooke: Perfect.
>
> Gilbert: Good. This is fine. The cops obviously have nothing else to do in Natick. **We [have] known the targets have been very impacted by this op. Perfect time for next phase."**
>
> Cooke: **Yes!**
>
> Baugh: Bring out bad boy please; these people are wasting our time. It's go time.

(¶ 82) (emphasis supplied).  Popp then sent the White Knight-related tweets that Cooke had already endorsed.  (¶ 90).

Cooke went on to obstruct the investigation, and to conceal the messages, the deliveries, and the surveillance—all of it.  He even agreed with Gilbert that using a GPS tracker on the Victims at some point—something he adamantly claims to have rejected on August 6—might be OK.  (¶ 104).  The government accordingly submits that by August 21, Cooke was part of a conspiracy that involved a pattern of activity.

For all of these reasons, the Court should accordingly apply the two-level enhancement under U.S.S.G. § 2A6.2(b)(1)(E).

<u>REQUESTED SENTENCE</u>

After considering each of the factors set forth at 18 U.S.C. § 3553(a), the Court should sentence Cooke concurrently to 30 months' imprisonment on each count of the Information.

*Seriousness of the Offense*

The impact of the offense on the Victims is one of many clear indications that Cooke's was a serious offense.

During the campaign, the Victims were not simply "rattled," as Gilbert put it.  (¶ 89).  They experienced the harassment and intimidation physically.  (¶ 123).  On August 16, 2019, the day Baugh, Zea, and Harville followed Victim 2 in a black van, Victim 1 described her husband looking ill, saw him sweating and nauseous, and was afraid he would have a heart attack.  For her part, Victim 1 felt pressure when breathing, experienced pain in her chest, and lost weight.  The trauma of not knowing what would come next is palpable in the Victims' statements.  Victim 1 aptly described the experience as "psychological torture".

Case 1:20-cr-10126-ADB   Document 21   Filed 07/22/21   Page 14 of 18

As cyberstalking frequently does, Cooke's crime cut the Victims off from their community. Victim 1 was afraid to go out in public. The Victims cancelled social engagements and a trip to see family and friends out of town, fearful that their stalkers would follow, and become others' stalkers. They even turned away offers of help and places to stay, afraid of putting their well-meaning friends at risk. Until the NPD put an end to the campaign, the Victims experienced it alone.

Nor has their fear abated with time. Nearly two years later, the Victims continue to memorize car license plates in public, carry pepper spray outside their home, and remain alert for signs of unusual activity in their neighborhood. Victim 2 relates that recounting these events "causes as much anxiety now as it did when they were happening to us two years ago".

Beyond the Victims' experience, the offense is serious for several other reasons.

First, Cooke and his coconspirators targeted the Victims based on what they had written and published, and because they had made space for others to publish in comments beneath the Newsletter's articles. Journalism about public companies, especially the world's largest ecommerce brands, is important to investors, merchants, and customers alike. That some at eBay disagreed with the Newsletter's coverage, and that Baugh shared that sentiment as justification to target the Victims, is abhorrent to First Amendment values.

While there is no good reason to harass and intimidate anyone, the logic that led to the Victims' suffering is absurd. Accepting for purposes of argument that Cooke and others were focused on Fidomaster and his online critiques, they harassed the Victims as a means of identifying and discrediting Fidomaster. That Cooke and others targeted innocent third parties is worthy of significant sanction.

Finally, Cooke's offense is more serious because he willfully obstructed the investigation into it. Setting aside (for a moment) his old job title, the Guidelines recognize obstructive conduct by anyone with a two-level enhancement. U.S.S.G. § 3C1.1. The WhatsApp Thread shows that Cooke, Gilbert, Popp, and Baugh set out to prevent the NPD from understanding eBay's role in the Victims' harassment, extending the investigation, causing NPD and the FBI to expend resources unnecessarily, and prolonging the uncertainty that the Victims experienced.

*History and Characteristics of the Defendant*

As noted, Cooke was not simply a harassing coconspirator bent on obstructing a stalking investigation. He served the Santa Clara Police Department for 27 years. A troubling aspect of Cooke's conviction is how quickly he abandoned the responsibility he owed the Victims. Cooke asserts that, in the August 6 meeting, he tried to talk his colleagues out of at least some parts of the harassment campaign. But what remained, even in his telling, was a series of increasingly harassing messages directed to a journalist, to set up a sting, to enable Gilbert to make a false offer of assistance, to predispose Victim 1 to help eBay with its Fidomaster problem.

Cooke should not have needed years of law enforcement experience to tell him the White Knight Strategy was criminal, but the fact that he had that experience and still joined the conspiracy is stunning. His experience should similarly have told Cooke that it was "over" when an NPD detective walked into the Ritz Carlton looking for Veronica Zea. Instead, Cooke ignored the better part of his professional life to protect himself and his friends. Worse, Cooke used his insider's knowledge of how police departments investigate crime to help obstruct the NPD investigation. (¶ 102 ("If I was the Detective, I would ask you for a local PD [contact] to go get video. Might want to keep that in mind")). A former police leader's obstruction is a significant

15

one, and the requested sentence should account for it.

Cooke's being overseas at the height of the harassment campaign would ordinarily, to a degree, mitigate his culpability. But his involvement as a former police officer lent the campaign credibility to Popp, Stockwell, and Zea. All were women in their twenties, with no law enforcement experience at all, and little professional experience beyond what they learned under Jim Baugh at eBay. Cooke, Gilbert, Harville, and Baugh—each of whom had decades of military, law enforcement, and/or security experience—had the knowledge to prevent what happened to the Victims, and then to prevent what happened to the NPD. That Cooke lent a veneer of credibility to the campaign and the obstruction counsels a significant sentence.

*General Deterrence*

Cooke is unlikely to reoffend, but a significant prison term for him will promote general deterrence. The non-custodial term that Cooke proposes will not.

Every large company in the United States will eventually get critical press, will have detractors online, and will be the object of unflattering (and likely profane) comments. Many of these companies value their corporate images, and with good reason track the public's perception of them. But companies and their security organizations are not law enforcement agencies. They cannot run "ops" (¶ 82) against and make "Persons of Interest" out of people who say things they dislike on the internet (¶¶ 54, 92). Cooke and his coconspirators engaged in illegal self-help instead of reporting a perceived threat to law enforcement. A significant sentence will reinforce the difference between actual corporate security and what happened in this case. The requested sentence will similarly affirm the idea that the laws apply equally all, even to those with skills they have acquired in public service.

*A Slight Variance is Warranted*

Based on what he did personally, Cooke did not in any sense play a minor role in this offense. His conviction speaks to how a conspiracy can involve defendants in Silicon Valley, Massachusetts, and abroad through the power, anonymity, and convenience of online communications. As noted above, Cooke's knowledge and experience were an important component in the planning, execution, and obstruction of the offense.

The government nevertheless submits that Cooke is less culpable than Baugh and Popp (as to whom the government will seek role enhancements), and Gilbert and Harville, who each assumed in-person roles in the harassment campaign (and in Gilbert's case the obstruction). Cooke is more culpable, however, than Stockwell and Zea (as to each of whom the government will seek a minor role adjustment). This relative culpability counsels a six-month variance below the Guidelines Sentencing Range applicable to him. The United States accordingly requests that the Court sentence Cooke to 30 months' imprisonment on the two counts of the Information. Given Cooke's substantial ability to pay—he receives $17,900 monthly on his police pension whether he ever works again—and the lack of any claim for restitution,[6] a fine at the low end of the Guidelines Sentencing Range is an appropriate component of the sentence.

---

[6]The Victims have informed the United States that they will forego their right to any restitution in this case.

## CONCLUSION

For all of the reasons stated above, the United States respectfully requests that the Court sentence Philip Cooke to 30 months' imprisonment, to pay a $15,000 fine, to serve three years' supervised release, and to pay the mandatory $200 special assessment.

Respectfully submitted,

NATHANIEL MENDELL
Acting United States Attorney

/s/Seth B. Kosto
SETH B. KOSTO
Assistant U.S. Attorney

July 22, 2021

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/Seth B. Kosto
SETH B. KOSTO
Assistant U.S. Attorney

July 22, 2021