UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,

                    Plaintiff,          Criminal Action
                                        No. 20-cr-10126-ADB-1
v.
                                        July 27, 2021
PHILIP COOKE,
                    Defendant.          Pages 1 to 58
_____


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT COURT
JOHN J. MOAKLEY U.S. COURTHOUSE
ONE COURTHOUSE WAY
BOSTON, MASSACHUSETTS  02210


JOAN M. DALY, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 5507
Boston, Massachusetts  02210
joanmdaly62@gmail.com

1    APPEARANCES:

2

     FOR THE GOVERNMENT:

3
             SETH KOSTO
4            Assistant U.S. Attorney
             U.S. Attorney's Office
5            John J. Moakley Courthouse
             Suite 920
6            One Courthouse Way
             Boston, Massachusetts 02210
7            617.748.3144
             seth.kosto@usdoj.gov
8

9
     FOR THE DEFENDANT:
10
             SUSAN WINKLER, ESQUIRE
11           Winkler Law LLC
             120 Holmes Street
12           Unit 313
             Quincy, MA 02171
13           617-642-6671
             Winkler.susan@gmail.com
14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                   (The following proceedings were held in open

3       court before the Honorable Allison D. Burroughs, United

4       States District Judge, United States District Court, District

5       of Massachusetts, One Courthouse Way, Boston, Massachusetts,

6       on July 27, 2021.

7                   The defendant, Philip Cooke, is present with

8       counsel.  The Assistant U.S. Attorney is present.)

9                   THE CLERK:  Court is in session.  Please be seated.

10      This is criminal matter 20-10126.  United States versus

11      Philip Cooke.  Will counsel identify themselves for the

12      record.

13                  MR. KOSTA:  Good morning, Your Honor.  Assistant

14      United States Attorney Seth Kosta on behalf of the

15      government.

16                  MS. WINKLER:  Good morning, Your Honor.  Susan

17      Winkler for defendant Phil Cooke who is at counsel table with

18      me.

19                  THE COURT:  Good to see you both, Mr. Cooke.  Just

20      a preliminary announcement or reminder.  If you're

21      vaccinated, you can be in here with no mask.  If you're not

22      vaccinated, you need to have a mask on.  If you are

23      vaccinated and you want to wear a mask anyway, that's fine.

24      I don't care.  But if you're not vaccinated, you need a mask.

25                  We are here for Mr. Cooke's sentencing.  In

1  preparation for the sentencing, I have received and read the

2  following:  Presentence report revised on July 20; the

3  defendant's sentencing memorandum filed on July 20; the

4  government's sentencing memorandum filed on July 22.  There

5  are 11 letters on behalf of the defendant, two victim impact

6  statements, and I have the transcript from the Ogden

7  sentencing sentencing which I think was provided by the

8  government, but I'm not sure.  Does anybody think there's

9  anything else that I should have been considering?

10           THE PROBATION OFFICER:  Not from probation, Your

11  Honor.

12           MR. KOSTA:  No, Your Honor.  Both victims are here

13  today and they would like to speak to the Court at the

14  appropriate time.

15           THE COURT:  That's fine.  I've read their

16  statements.  If you want to additionally speak, that's fine

17  with me.

18           MS. WINKLER:  Nothing further, Your Honor.

19           THE COURT:  Ms. Winkler, as long as I have

20  probation, I take it nothing has about withheld from the

21  report?

22           THE PROBATION OFFICER:  No, Your Honor.

23           THE COURT:  Ms. Winkler, have you had an

24  opportunity to review the presentence report?

25           MS. WINKLER:  Yes, Your Honor.

```
1              THE COURT:  Have you gone over it with your client?
2              MS. WINKLER:  I have, Your Honor.
3              THE COURT:  Mr. Cooke, have you had an opportunity
4    to review the presentence report?
5              MS. WINKLER:  Yes, Your Honor.
6              THE COURT:  If you guys want to stand up and sit
7    down, that's absolutely fine.  If you want to remain seated,
8    that is also absolutely fine.  Mr. Cooke, have you had an
9    opportunity to go over it with your counsel?
10             THE DEFENDANT:  Yes, Your Honor.
11             THE COURT:  There are no objections on the part of
12   the government.  There are 11 objections on the part of the
13   defendant, most of which I think don't need to be resolved.
14   So let me just run through them quickly.  The first one were
15   a series of corrections that have been made by probation.  2,
16   3, 4, and 5, 6, are all things that I have noted but they
17   don't actually change the calculation.  Let me just double
18   check that to see if one of them does.
19             MS. WINKLER:  Your Honor, I believe it's 2 through
20   8 that are for information for you only.
21             THE COURT:  2, 3, 4, 5, 6, 7, 8.  The 9th one is
22   the discussion about the pattern of activity enhancement;
23   that paragraph 10 reflects the changes that would come about
24   depending on how the pattern of activity enhancement
25   objection is handled.  And 11 is just a series of updates
```

1    which I understand.

2              It seems like the disputed issue is the pattern of

3    activity enhancement.  I have to say I've read the

4    guidelines.  I've read the case law.  I've read the

5    commentary.  It is extremely poorly drafted and hard to

6    understand.  What I would like -- I think I understand your

7    position on this, Ms. Winkler.  I'll give you a chance to

8    speak on it in a moment.

9              Mr. Kosta, can you describe for me the conviction

10   under the statute that would not bring the enhancement into

11   play?

12             MR. KOSTA:  A conviction under 2261A or a

13   conspiracy for it does have it as an element a course of

14   conduct which consists of two or more events.

15             THE COURT:  That's my problem.

16             MR. KOSTA:  And that's a problem that the First

17   Circuit has spoken to in *Fiume*.  Where the commission wants

18   to permit or not permit double counting, it's not shy about

19   saying so.  The fact that there are two other statutes that

20   are also referenced it 2A6.2 that do not include course of

21   conduct.  The fact that the commission goes about actually

22   speaking to other instances of double counting in the

23   commentary under 2A6.2 indicates as *Fiume* and basically holds

24   with respect to one of the other five aggravating factor.  I

25   think it was the court order factor.  Let's take it from the

1    court order factor in *Fiume*.  *Fiume* involved a conviction for

2    violating a court order that then went to apply a court order

3    enhancement two additional levels.  The court held that the

4    fact that the second, there's no situation in which a court

5    order could be violated under the statute in which it

6    couldn't be under the guidelines was immaterial because the

7    commission, one, would have spoken to it.  And they regularly

8    do.

9            And I'd point the Court to the commentary under

10   application note 4, which we're not dealing with particularly

11   today.  This deals with multiple counts and how they're

12   applied.  But the commission says that the grouping procedure

13   described in application of 4, I'm on page 81 of the red

14   book, Your Honor, avoids unwarranted double counting with the

15   enhancement in subsection B1E for multiple acts of stalking,

16   threatening, harassing or assaulting the same victim.

17           The idea here being the commission recognizes the

18   potential for double counting has expressly not applied with

19   respect to the pattern of activity.  And that's essentially

20   what the court in *Fiume* held and the fact that *Fiume* deals

21   with court order and this deals with pattern of activity

22   shouldn't be material to the reasoning.

23           THE COURT:  Ms. Winkler?

24           MS. WINKLER:  Your Honor, I think a close read of

25   the cases actually suggest the opposite to what Mr. Kosta is

1    suggesting.  In *Lee*, the case that is cited by probation, the

2    offensive conviction was interstate stalking.

3            THE COURT:  Yes.

4            MS. WINKLER:  It was the emails that were a

5    pattern.  So they were add-on.

6            THE COURT:  Right.

7            MS. WINKLER:  They were not the offense.  In *Fiume*,

8    the court actually notes, they say the commission may have

9    rationally intended upon or punish a stalking type offense

10   more seriously where it simultaneously involved the violation

11   of court order.  I think the First Circuit appreciates the

12   difference between a court order and use of email or

13   interstate communication.  There are different levels of

14   crimes set forth in the statute itself.

15            The other cases that are under -- that have

16   addressed this problem in the First Circuit similarly reflect

17   the offense conduct and the pattern are different or they

18   actually refer to like in *Sayer*, the First Circuit referred

19   to the long term pattern.  In *Robinson* there was a choking

20   and an assault conviction, but it was the letters that the

21   defendant sent when he was incarcerated that became part of

22   the of the pattern.  And I think that is --

23            So if you look a little deeper than just the

24   language the First Circuit uses in *Fiume*, I don't think *Fiume*

25   controls in this circumstance.  They're talking about --

1    they're not talking about this kind of situation.  Yes, in

2    the absence of an express prohibition, they're saying

3    generally the Sentencing Commission speaks to double

4    counting.  In this case the First Circuit has never

5    addressed, never taken head-on the question of course of

6    conduct and being two or more instances being the same as, in

7    this case, more than one electronic communication.  And that

8    then would slide us into the facts, if you want us to go

9    there yet.

10            THE COURT:  I know there are other judges that are

11   going to be sentencing other people in this case.  The

12   resolution of this issue I would rather leave to them.  I

13   don't think it's particularly material in this sentencing or

14   not, whether or not those two points are added.  The plus or

15   minus of those two points is not going to affect what I do

16   mainly because I'm focused on the conduct and not exactly

17   where we come out on the guideline number.

18            Particularly where my understanding from the

19   submissions that the government is going to recommend

20   something in the vicinity of 30 months, which is within the

21   guideline range, certainly under the calculation without the

22   extra two points.

23            So given my view that how this issue was resolved

24   is not going to affect where I ultimately come out on the

25   sentencing.  Does it need to be further resolved than that

1    because it is not going to affect my sentence.  My proposal

2    is I do the guideline calculation without it but without

3    actually ruling on the issue.  It's a plea.  It's a contested

4    sentencing but it's not a contested sentencing after a trial

5    where this has the potential to really factor in.  I

6    understand this is taking the easy way out of what I think is

7    a difficult call.  Mr. Kosta?

8              MR. KOSTA:  Your Honor, the government is going to

9    recommend 30 months incarceration regardless of how the Court

10   rules or does not rule.  I do think it's important that

11   factually as Ms. Winkler was saying that the Court recognize

12   the facts that there is harassing conduct here.  There is

13   threatening conduct here.  There is also stalking conduct in

14   relation to the surveillance that took place while Mr. Cooke

15   was abroad.  And we have an express adoption.

16              The short way of this is let's set aside *Lee* and

17   whether or not it controls.  What I think the government's

18   strongest argument is on the factual applicability of the

19   three different types of harassment is by the time that

20   WhatsApp threat sees the light of the world, Mr. Cooke is

21   advised of the fact that there are deliveries, the fact that

22   there's been surveillance, and the fact that the harassing

23   messages that he says he authorized in the August 6 meeting

24   became threatening messages.  So we have a --

25              THE COURT:  Let me interrupt you.  This is a

1    reading of the guideline that I don't agree with.  I don't

2    think that the guideline is contemplating -- you could have

3    charged him with all of those things and maybe dated back to

4    the language of the indictment.  It can't be that you charge

5    him with one of those things then all of this happened, that

6    that gives you the enhancement [technical issue] -- doesn't

7    apply.

8              MR. KOSTA:  We've charged him with conspiracy to do

9    those things.

10             THE COURT:  I think the guideline is focusing on a

11   pattern.  It's not focusing on whether they've done one, two,

12   or three of those things I don't think.

13             MR. KOSTA:  But that's where the application note

14   one, the example, is very telling.  It says a single instance

15   of stalking accompanied by a separate instance of

16   threatening.  It contemplates that these things take place

17   simultaneously.  It's not one big instance as long as the

18   objective was to harass the victims.  That doesn't make it

19   open season for any number of different kinds of stalking

20   without the pattern of activity applying.

21             THE COURT:  You're talking about a statute that

22   already requires a pattern.  You're not going to be here on

23   something where you have a single instance of stalking.

24             MR. KOSTA:  You could be here -- yes.  But that

25   takes us right back into the double counting argument which

1    *Fiume* has rejected.  I know the Court doesn't want to reach
2    that issue.
3              THE COURT:  I'm not sure *Fiume* has rejected that.
4    The cases like *Lee*, which is the one I spent the most time
5    with, she's right when she says there was the crossing the
6    state lines aspect of it and separate from the actual offense
7    itself.
8              MR. KOSTA:  The only facts that the court
9    considered in reaching that pattern of activity enhancement
10   in April of 2012, the Court in its footnote 3 says, We need
11   not reach whether the 2010 conduct was directly or
12   substantially related to the offense of conviction because we
13   find that the series of threatening emails suffices.
14             There was a lot going on in *Lee*, but the only thing
15   the First Circuit was concerned about was the spring of 2012
16   and the series emails that the defendant sent to the victim.
17   It wasn't even concerned with the phone calls that were made
18   to the mother.  It says the pattern of email suffices.  What
19   that says to the government at least is that two or more
20   emails suffices, constitutes in the language of the
21   application of two or more separate instances of stalking or
22   harassing or threatening.
23             THE COURT:  What's probation's view on this.
24   Pattern review on this?
25             THE PROBATION OFFICER:  With regard to the pattern

1      I rely on the Court.

2                THE COURT:  Great.

3                THE PROBATION OFFICER:  With regard to accepting or

4      not accepting that enhancement, I believe the statement of

5      reasons just says to have a total offense level.  And that's

6      where that may become an issue.

7                THE COURT:  What I would do is duck the issue and

8      just use the lower guideline calculation without actually

9      ruling on the objection.  I don't want to bind the courts

10     that come after me, as appealing as that may be, to the

11     government.  There are other people that will have reason to

12     think about this more deeply than I have reason to think

13     about it right now given what we're fighting over.

14               MR. KOSTA:  Candidly, the defendants as to who that

15     guideline will apply are or not apply stand in different

16     shoes than Mr. Cooke.  We'd be in a position asking for it

17     anyway.

18               THE COURT:  So as I say, it's not -- the resolution

19     of this issue is not going to affect the sentence.  I haven't

20     decided the sentence, but when I think about what goes into

21     coming up with a sentence in this case, it is the pattern of

22     activity.  It's not whether it actually changes the advisory

23     guideline range.  Are you interested in giving up the two

24     points voluntary in this case, Mr. Kosta?

25               MR. KOSTA:  No.  If the Court is not going to rule.

```
1              THE COURT:  Are you content with that?

2              MS. WINKLER:  We are content, Your Honor.

3              THE COURT:  I'll leave it at this for those that

4     come after me.  I don't know the answer to this question.  I

5     don't think it's an easy thing.  And I think that the

6     guidelines are poorly drafted on it.  It would lead to double

7     counting; that the application notes from the case law don't

8     make clear to me that it's what the guideline commission

9     contemplated, but I also accept and agree with Mr. Kosta that

10    there are aspects of the sentencing guidelines where double

11    counting is allowed and contemplated, but I'm just not sure

12    this is one of them, and I'm not going to come down with a

13    decision on that given how that issue is resolved is not

14    particularly material to the sentencing that we're going to

15    do today.  So that is a punt.

16              I am going to sentence him based on the following

17    advisory guideline sentencing range with the understanding

18    that my focus is on the conduct and not so much on the exact

19    place where the guidelines end up.  With the grouping and

20    where I come out with an adjusted base offense level of 19

21    which results in an advisory guideline sentencing range of 30

22    to 37 months given that he has zero criminal history points

23    and is in Criminal History Category I.  So again that's 30 to

24    37 months.  Supervised release range of one to three years.

25    Do those two points change the guideline?
```

1          THE PROBATION OFFICER:  Yes, Your Honor.  10,000 to

2    $100,000 is the new fine range.

3          THE COURT:  10,000 to 100,000 under the guideline

4    fine range.  250,000 under the statute.  There's been no

5    request for restitution made to this point.  If you

6    anticipate that, we can defer on that.

7          MR. KOSTA:  I don't anticipate a restitution

8    request, Your Honor.

9          THE COURT:  No restitution request and a mandatory

10   special assessment of $200.  Are we all in agreement that

11   that's where we are at this moment in time?

12         THE PROBATION OFFICER:  Yes, Your Honor.

13         THE COURT:  Am I correct?

14         THE PROBATION OFFICER:  Yes.

15         THE COURT:  Mr. Kosta?

16         MR. KOSTA:  With the caveat that we think the

17   proper guidelines calculations is 37 to 46 months but we

18   understand the Court is not deciding that issue and it won't

19   impact the Court's sentence.

20         MS. WINKLER:  We agree, Your Honor.

21         THE COURT:  Mr. Kosta, I read your sentence

22   memoranda.  I'm happy to hear whatever position or argument

23   you want to make.

24         MR. KOSTA:  I thought I would not reargue my memo

25   to you.

```
 1              THE COURT:  You're welcome to.  I have read it.

 2              MR. KOSTA:  Before I begin, would the Court hear

 3    from the victims?

 4              THE COURT:  I am going to hear from the victims,

 5    but I normally do it your recommendation, her recommendation,

 6    then the victims, and then the defendant.  If you have some

 7    reason that you want me to do it differently, I can.

 8              MR. KOSTA:  I don't feel strongly about it, Your

 9    Honor.  You've read their statements.

10              THE COURT:  Yes.

11              MR. KOSTA:  The memo speaks to the physical and

12    social and psychological impact that this offense had on the

13    victims and is continuing to have on the victims.  I'll note

14    that the victims have been very brave and patient through the

15    pandemic even though this conduct predated the pandemic to

16    getting to this point to be able to address you today.

17              As I was thinking about the sentence, though, I

18    realize that every cyberstalking case that I'm familiar with,

19    and I've handled a bunch in the district or supervised ones

20    that come down, has a victim that's grievously mistreated.

21    The Court had the Cardozo matter where a young woman wrote

22    off her experience being sexually assaulted as a 13-year-old.

23    Custus was a case where a woman was stalked by her then

24    boyfriend anonymously.  The Lynn case, probably the longest

25    cyberstalking sentence in the courthouse was a woman who
```

1    happened to move into the defendant's home in response to a

2    Craig's List post.  There are other cases.  But they all

3    involve blameless victims.

4         Usually there's a loan actor, someone who may have

5    significant issues of his or her own who is responsible for

6    the harassment, the ex-spouse, the ex-boyfriend, the roommate

7    in Lynn's case with serious issues.  And what happened to the

8    victims here is obviously serious and unspeakable.

9         But the fact that so many people came together to

10   accomplish this objective is one of the different and

11   significant facts about this case.  Sometimes people think of

12   a conspiracy charge almost as a junior varsity charge,

13   there's just an agreement, there's no completion of the act.

14   The government submits that the conspiracy charge here is

15   appropriate, and it underscores the seriousness of this

16   offense.

17        I think the Court knows that Mr. D'Addio and I

18   teach over at BU, and we taught this term of a Supreme Court

19   case called *Ionelli*.  It goes away back to 1975.  It's at 420

20   U.S. 770.  I never thought I'd cite it in an argument to the

21   Court, but it talks about partnership in crime and what it is

22   that makes conspiracy a very significant and different

23   offense from the substantive offenses themselves, and it

24   applies almost dead-on to what happened here.

25        The court held that the concerted action, that

1    partnership in crime, makes success more likely because

2    co-conspirators are less likely to walk away from a group.

3    And we have that in spades in this case.

4         We have this group of E-bay employees almost

5    unquestionably backing their bosses and accomplishing what

6    their view is of what the company wants.  We have friends

7    backing up friends.  Mr. Cooke when he finds out all of this

8    is happened says in his memo he wanted to back up his friend

9    from the police force, Mr. Gilbert.  People are less likely

10   to walk away from a conspiracy that's come together to

11   accomplice a person.  That conspiracy in this case allowed

12   for something else that *Ionelli* talks about which is

13   specialization and complexity.

14        We have this almost like MBA situation here where a

15   group of people come together and they have brainstorming

16   sessions separately about how the harassment is going to

17   work, how the surveillance is going to flow, what packages

18   should be sent to the victims' homes, participants bringing

19   different expertise.  Some knowledgeable about how to keep

20   from getting caught on the Internet; some knowledge about the

21   way Twitter and eBay work; some knowledge, as in Mr. Cooke's

22   case, about how law enforcement can be involved in this.

23        The image that keeps coming back to me is this

24   meeting that Mr. Cooke participated in on August 6 at which

25   they set forth the lines of a harassment of the victims in

1    this case with an intent to essentially soften her up and

2    soften her husband up so they could get help to identify

3    Fidomaster.  That's the most benign expression of it.  And

4    they left that meeting, a planning meeting, with the

5    conclusion that that conclusion was appropriate.  And I think

6    part of that comes from the fact of this specialization,

7    people bringing different roles to the conspiracy.

8            You have this group think problem where people get

9    together and start brainstorming, the ideas get better and

10   better, and what happened to the victims got worse and worse

11   than if it had just been a single individual sitting in a

12   basement fuming about the injustice of what happened in their

13   relationship.

14           The Supreme Court also said in *Ionelli* that the

15   combination in crime, that partnership in crime, makes more

16   likely the commission of crimes unrelated to the original

17   purpose for which the group was formed which is again even

18   crediting the idea that something more limited was talked

19   about on August 6, it became much much worse as a result of

20   the fact that it was so planned by group thinking.

21           And I think it also allows for a lot of what the

22   Court is hearing in this proceeding about sort of

23   compartmentalization, well, I knew about this, I wasn't aware

24   of that, I approved this kind of message, I had no idea this

25   kind of message would follow.  Whether or not the Court

1    credits those sort of after-the-fact limitations, that's one

2    thing that makes this crime difficult to investigate and to

3    gather around because it was divided into so many different

4    silos that it allowed a degree of deniability.

5         And so we're asking the Court to punish this

6    conspiracy with that significant sentence, that 31 sentence,

7    because while it was just an agreement, the conspiracy made

8    this offense worse than if it had just been even a single

9    disgruntled employee.  The fact that seven people got

10   together makes it more serious.

11        I'd also point the Court to the fact that there are

12   really two significant crimes here.  You've just mentioned

13   the cyberstalking.  Haven't even mentioned the obstruction

14   yet.  In the government's view, either would justify a

15   significant jail sentence.  The government isn't familiar

16   with a cyberstalking case that doesn't involve a significant

17   jail sentence.

18        The Court sentenced Mr. Cardozo on very serious

19   facts, Mr. Lynn with a whole variety of conduct involved, 17

20   years.  He's a bit of an outlier.  You don't see a lot of

21   noncustodial cases for cyberstalking alone in this district

22   and elsewhere the government would submit.

23        Combining them adds two points to the guidelines.

24   You have the obstruction object.

25        THE COURT:  Yes.

1              MR. KOSTA:  You have the cyberstalking object.
2     It's difficult to imagine how taking two serious crimes in
3     their own right and combining them with a rather small amount
4     of adjustment given these two crimes would justify the kind
5     of sentence that Ms. Winkler has requested on Mr. Cooke's
6     behalf.  I think that's particularly true where the defendant
7     is a former law enforcement officer.  I've spoken about that
8     in our memo.  In preparing today I've had the chance to read
9     the letters and commendations that Ms. Winkler submitted on
10    behalf of Mr. Cooke.  And I think it's clear that his friends
11    and family see a great deal of good in him.  That's not
12    surprising even with the prosecutors, I think there are acts
13    of bravery and kindness and compassion reflected in those
14    letters.  But there's a big "but" there.  And for the
15    government it's this:  How does the man in those letters, how
16    does the retired captain in the police department in those
17    letters do this to those victims who will address the Court?
18              Mr. Cooke was in incident response, was a SWAT team
19    leader.  He was the hostage negotiator for the Santa Clara
20    Police Department.  He had 30 years of experience that led
21    him up to that moment where he sat down in a meeting and
22    planned to cyberstalk Victims 1 and 2 to degrees that I can't
23    comprehend.  And he had 30 years of experience to do the same
24    with respect to the police investigation that followed.  This
25    is an officer who investigated internal affairs matters.  He

knew according to these letters how to investigate a cop that
bent the law or broke the rules.  He had all the experience
necessary to make the right decision when the Natick Police
Department came knocking.

It doesn't matter in the government's view if you
go to the FBI academy if you don't put to use what you've
learned there.  It doesn't matter in the government's view if
you are the best incident commander for Super Bowl 50 and
handled the incursions in the air space that gets you a
commendation from the general who's managing the safety at
the event.  To get it wrong for a powerless pair of victims
in Massachusetts.

It wasn't just not standing up.  We talk about
being an upstander in my household.  It wasn't just about not
standing up.  He piled onto them when it was apparent they
were rattled, when it was apparent they were disturbed.
Mr. Gilbert says, perfect, they're rattled, time for the next
phase.  And Mr. Cooke, somewhere else, somewhere in Asia,
yes, jumps right in.

And the idea that a retired law enforcement officer
in that series of letters or two of them would ask the Court
to impose a noncustodial sentence in this case is troubling.
I'd expect that from friends and family.  But that was a
little jarring for what the Court's going to do, which is
evaluate the totality of his conduct and its seriousness.

1           The place I'd end, Your Honor, is just the idea of

2   general deterrence.  The memo already speaks to the idea of

3   corporations not liking what's said about them in this unique

4   and absurd situation where negative comments on a website

5   about a corporation lead to an attack on a journalist who

6   posts a website where those comments are placed.

7           There is a different aspect of general deterrence

8   that the government submits is necessary in light of the

9   Lynn, Custus, and Cardozo-type cases that are here, and it's

10  the havoc that anyone can create with a keyboard.  People

11  write and the people in this case wrote criminal threats and

12  engaged in harassment over the Internet that from thousands

13  of miles away things that the government submits they

14  probably would not do if sitting down across a table in a

15  business meeting with Victim 1 and Victim 2.  And there is

16  something there that needs to be deterred.

17          Judge Young was the sentencing judge in the United

18  States versus Lynn, and I'm just going to close with

19  something he said in that sentencing which I think is

20  applicable here.  The result isn't the question.  Lynn was

21  just an outlier in every way and earned every day of those 17

22  years that he got.  Judge Young focused on how interconnected

23  we are as a community, and I think that's what this sentence

24  should reach to.  Because what this group of seven people

25  did, what Mr. Cooke did as part of that group was break a

1    duty that he owed, whatever his job was, the way that people
2    should treat each other.  Judge Young said, This conduct is
3    monstrous.  We live in a community, reading this entire
4    record, listening to the victims, listening to the Assistant
5    Attorneys, listening to your counsel who has done a superb
6    job on your behalf, not the least the negotiation of the plea
7    agreement.
8              He's right to point out all of these crimes
9    committed were with you sitting behind a commuter.  That
10   point is well taken.  Yet in today's world, that does not
11   diminish the crimes in any way.  In fact, it ought to bring
12   home to all of us how interconnected we are and what havoc
13   can be wreaked by the improper evil criminal conduct in which
14   you so gleefully engaged.  I'll grant that you may not have
15   fully appreciated the harm you did to your specific victims
16   and to the community as a whole.  In the eyes of this Court
17   that does not diminish the sentence which ought to be
18   imposed.
19             Respectfully, Your Honor, the Court should take
20   into account that breach of the interconnectedness that we
21   owe to each other, and that this group of defendants ran
22   roughshod over the course of this conspiracy.  Thank you.
23             THE COURT:  Ms. Winkler.
24             MS. WINKLER:  With regard to what Mr. Kosta says
25   about conspiracy.  There is no question a conspiracy

1      dangerous.  But in this sentencing we're looking at an

2      individual and his role in this particular set of activities.

3      This is an individual who did, while he did participate in

4      that August 6 meeting, he did not participate in the follow

5      up meeting that day about deliveries.

6              He did not participate in the August 14 meeting

7      about surveillance both of which are detailed in the

8      indictment against Jim Baugh but are not present in the

9      information here.  And so the question becomes what was

10     reasonably foreseeable to Mr. Cooke when he left that

11     August 6 meeting thinking that he had talked to his

12     co-conspirators out of surveillance and tracking and

13     threatening deliveries and threatening messages.

14             At least as of that day what was reasonably

15     foreseeable to him would be what a reasonable person who knew

16     everything he knew at that time would have been able to know

17     in advance with a fair degree of probability.  That comes

18     from U.S. v. Lacroix.  It's a First Circuit case from 1994.

19     Here is a situation where being a former police officer hurt

20     Mr. Cooke.  Imagine being in a meeting with people talking

21     about doing the kinds of things that Jim Baugh was tossing

22     out as options for harassment of these victims.  It's just

23     not logical.  None of it makes sense.

24             Supposedly, according to Mr. Baugh, this person

25     named Fidomaster, who he didn't know who he was, had

1    threatened Devon Wood and his family, which is of course what

2    the police officers in the room, Mr. Cooke and Mr. Gilbert,

3    needed to hear to think that they should be taking steps to

4    help the executives.  That's what they were there for.

5         That's the kind of lies that Jim Baugh seemed to

6    tell with a frequent -- whenever necessary for him.  For

7    example, he tells Ms. Popp according to Ms. Popp that

8    Mr. Gilbert and Mr. Cooke was there to approve the messages.

9    He never told that to Mr. Cooke or Mr. Popp who, yes, they

10   were there, yes, they saw some of the draft messages, but

11   they didn't understand they were proffers of these Twitter

12   messages.  They thought they were there to set some

13   guardrails.  You cannot threaten.  You have to stop when

14   someone says stop.  So there were guardrails they were

15   setting up.

16        They did agree to the harassment with the idea

17   under this white night strategy as the government calls it,

18   that it would soften the victims up so they would identify

19   Fidomaster and so the protection group could help protect,

20   better protect Devon and his family.  That was the idea.

21        Now, for him to believe that this group of people

22   who he liked, who he knew and liked as colleagues, and

23   particularly Brian Gilbert, who was his close friend for over

24   25 years, would engage in such dangerous, awful, illegal

25   conduct as they did, whether it was delivering pig heads and

1    funeral wreaths, surveillance, role play, sending people to

2    the door to suggest they had been called there for awful

3    reasons.  That was not something that he could foresee that

4    it would go so far off the rails, that these people would

5    engage in that kind of conduct.

6           So on August 7 Jim Baugh says, stay here, I don't

7    want you to take your trip overseas.  Mr. Cooke ignored that

8    directive.  He left.  He went overseas.  And while over

9    there, he starts to get some Twitter messages and there is a

10   stream -- or WhatsApp messages on August 20.  And the first

11   ones that come in are these where Brian Gilbert -- and they

12   are harassing messages.  Those are harassing messages.  And

13   they're going to take place over three accounts with the idea

14   that it's going to soften the victims up for that final call.

15   They all take place on August 20 and the call was placed on

16   August 21.

17          And that's the cyberstalking conspiracy as

18   Mr. Cooke then knew it.  He did not know that surveillance

19   had taken place at the time those messages came in.  He did

20   not know that they had broken in to try to put on a tracker.

21   He did not know that those deliveries had occurred or that

22   they had been signed up for all of these different magazines

23   and other websites that they had no interest in.

24          So from where he stood, yes, he did engage in a

25   cyberstalking conspiracy, which he pled guilty to and

1   accepted responsibility for, but it was on that day.  That

2   does not explain the witness tampering, the assistance and

3   creating the deception of the Natick Police.  And I think the

4   best thing is to let Mr. Cooke speak to that when he provides

5   a statement, Your Honor.  There is, frankly, that, yes, it's

6   an obstruction, it does add two points to the guideline

7   calculation.

8            There's nothing to be said except that he did not

9   make it worse when he dealt with the people at eBay.  For

10  them at least he did not lie.  He did not -- he's not even

11  mentioned in that part of the PSR because he was not involved

12  in that.  That was the other group.  He wasn't even in town

13  on August 26 when they got together and decided what they

14  were going to do.  He was still overseas.  He didn't get back

15  until early September.

16           So that was with regard to conspiracy and what he

17  knew and did.  And while -- let me turn now to the reason for

18  a variance, Your Honor.  I won't go back over all of the --

19  Although I will say, it is a pleasure to represent someone

20  who has had the career that Mr. Cooke has had.  And prior to

21  this horrible judgment, he had a wonderful, admirable,

22  exemplary career, pulling himself up from a neighborhood that

23  was tough, going through the Marine Reserves honorably, doing

24  his time at the Department of Corrections as a correctional

25  officer, and ultimately being a police officer and conducting

1    hundreds of investigations.

2          There is no question he had an outstanding career.

3    He worked incredibly hard.  And as the letters attest, he is

4    an incredibly kind, generous, giving man.  He sacrificed for

5    his community, for his family, and his selflessness is

6    apparent in the different letters that are attached to his

7    sentencing memorandum.

8          He retired on December 24, 2016, and in some ways

9    this is a story of a failed retirement.  Mr. Cooke left a job

10   that was incredibly demanding and suddenly had no purpose, no

11   particular thing to do with his life.  He was bored.  He

12   didn't have his colleagues.  He didn't have the information,

13   the direction, if you will, that he needed at that point in

14   time.  And as his wife explained, he began to drink heavily.

15         Sometimes it was frustrating to her because he

16   wouldn't remember things or wouldn't understand what she was

17   saying.  Believing it would help him to go back to work, she

18   encouraged him to.  And he did.  He found a job as a

19   contractor with Progressive Force.  The Silicon Valleys were

20   looking to have people on campus to help in case of

21   emergencies.

22         He took a job with eBay eventually, which didn't

23   help at all because eBay had an on campus bar that opened at

24   3:00, and apparently there was a lot of heavy drinking that

25   went on starting in the midafternoon and carrying through

1      into the late evenings.  So there was a worsening of his

2      alcoholism, not a getting better in connection with what

3      happened at eBay.

4             Since being notified he was a target, Mr. Cooke has

5      dealt with that problem.  As part of court ordered therapy,

6      he saw a therapist.  He accepted his alcoholism problem.  He

7      has not been drunk since June 2020.  He has taken the time

8      and made the effort to become a counselor/facilitator for an

9      addict recovery program in California where he facilitates

10     meetings of addicts.  He goes to meetings himself, and he

11     facilitates meetings of friends and family.  All of which

12     he's done to make sure that his life has turned around as a

13     result of the horrible things that happened at eBay.

14            So in terms of the three factors, I leave the

15     overstating seriousness to the brief.  For specific

16     deterrence, this is not a man who will re-offend.

17            THE COURT:  I agree.

18            MS. WINKLER:  With regard to general deterrence,

19     there has been huge press in his area where the Fortune 500

20     Silicon Valley companies are located.  I take Mr. Kosta's

21     point people sometimes don't like what's written about them

22     in the press.  But between this case, which has received

23     substantial press and the significant civil RICO suit that

24     was filed last week on behalf of the victims complete with

25     press conference and was shown at least on nightly news here,

1    I don't know whether it made nightly news in Santa Clara or

2    the Silicon Valley, that is the kind of risk that teaches

3    companies they don't want to see anything like this happen

4    under their watch.  That's significant on both fronts.

5         If an incarcerative sentence is necessary, if the

6    Court believes that, I would suggest 30 months is way more

7    than necessary.  It is the fact of incarceration that deters,

8    not the amount.  So if there is a need for that kind of

9    sentence, a much lower amount will accomplish the same

10   purpose of sending a message that this is a serious crime

11   that could result in prison time.  And I think partly to

12   that, incarcerative sentences are much harsher in this time

13   of COVID.

14        And while certain things are opening up like this

15   courtroom, the prisons are still requiring segregation,

16   isolation for two weeks upon entry with that sometimes

17   extended if someone touches or comes in contact with somebody

18   else who has COVID.  And those incarceration times now, there

19   are less programs, less opportunities than there used to be

20   all because of COVID to try to protect the populations in the

21   prisons.

22        So that in terms of training and programs, I don't

23   think there's anything he can get in prison that he can't get

24   and hasn't done for himself outside, and home confinement

25   would allow him to continue that.

1          For the sentencing disparities, I'll just rely on

2     the briefs.  I think the important points are he was abroad.

3     He was not on the ground in Massachusetts.  He did not come

4     here and stalk anyone.  He was not involved in the delivery

5     of those threatening and scary packages.  All of which made

6     worse the electronic communications, the Twitter messages

7     that went to the victims.  But not knowing about those, he

8     couldn't appreciate the full scope of what was going on and

9     the effect it could have.  That's not an excuse.  That's just

10    a fact.  There was only so much that was foreseeable to him.

11         And for those reasons, Your Honor, we would request

12    that home confinement would accomplish the purposes of the

13    sentencing guidelines.  And that if you feel an incarcerative

14    sentence is necessary, we ask for a short one.  For example,

15    in Varsity Blues, we saw how significant even a short period

16    of incarceration can be for all kinds of individuals such

17    that that would accomplish the purposes that Mr. Kosta points

18    to in the 3553(a) factors.

19         THE COURT:  I'd rather hear the impact statements,

20    if the victims want to be further heard.

21         MR. KOSTA:  They would like to speak.  Will the

22    Court permit me one brief minute?

23         THE COURT:  Yes.

24         MR. KOSTA:  The granularity of the WhatsApp threat

25    that the government managed to find starting on August 20 and

1    continuing through August 23, most of the devices in this

2    case were deleted.  Pointed out to the Court that Mr. Cooke's

3    device came back to eBay with none of this on it.  The idea

4    that there is that degree of granularity between the 20th and

5    the 23rd that Mr. Cooke has to be responsible for because his

6    name is on it and he's participating in it, and he's

7    ha-ha-ha-ing all the way through the lies the idea that --

8              THE COURT:  You think he's responsible for what

9    happened during those days, or are you saying he was not

10   aware of it?

11             MR. KOSTA:  I'm saying that the idea -- on the 20th

12   to 23rd, he is fully aware of what's happening and he stays

13   involved.

14             THE COURT:  Yes.

15             MR. KOSTA:  But what the PSR says is there was a

16   series of WhatsApp messages that continued from the 7th all

17   the way to the 23rd.  We found the one from the 20th to the

18   23rd, and the idea because it's not in writing it didn't

19   happen and there wasn't this kind of information and

20   communication between the 7th and the 20th is not a factual

21   issue that the Court names to resolve seems awfully unlikely

22   that suddenly on August 20 Mr. Cooke is let into a small

23   portion of this conspiracy.  But I'll defer to the victim's

24   time.  I appreciate the Court giving me a minute.

25             We have Victim 1 and Victim 2.  Who would like to

1    speak first.  Victim 2, Your Honor.  Is it okay if he sits?

2          THE COURT:  Yes.

3          VICTIM 2:  Thank you, Your Honor.  My name is David

4    Steiner.  I am Victim 2 in this criminal complaint.  I want

5    you to know how important it was for us to be here to let the

6    defendant know that we were not faceless concepts at the end

7    of a tweet or an email; that we were flesh and blood human

8    beings that were deeply affected by his actions.  This has

9    been a difficult two years for Ina and myself.  The actions

10   of Philip Cooke, the other defendants and all involved in

11   these concepts.  Employees involved have done immeasurable

12   harm to us, physically, mentally, and emotionally.  Online

13   threats, disturbing deliveries at all hours of the day and

14   night and early morning, being tailed in our car were daily

15   occurrences in August of 2019.

16          It would take too long to detail all the ways that

17   defendant Cooke and eBay's aggressive acts affected our lives

18   and caused as much anxiety as it did when it happened to us

19   two years ago.  We had an endless parade of Natick Police

20   cruisers parking in front of our home.  We spent hours with

21   patrolmen filling out accomplice reports.  But one particular

22   date exemplified the date of siege we were under.  We were

23   exhausted from weeks of relentless attacks by assailants who

24   were at the time unknown to us.  We did not feel safe leaving

25   our home and spent this particularly stressful day barricaded

1    in our house with a friend's borrowed car blocking the head

2    of that driveway to scathe off unwanted deliveries.  A stack

3    of baking sheets was leaning against our back door so we

4    could hear anyone trying to break into our home.  That day we

5    only answered the door to the Natick Police and to explain to

6    visitors that we were not having a yard sale, and we weren't

7    selling off the contents of our home.  That day was our 31st

8    wedding anniversary.

9            Defendant Cooke was involved in the early planning

10   of the attack on us.  He approved threatening Twitter

11   messages that were sent to my wife, the listing of our home

12   address and the decision to mislead Natick Police Department

13   and obstruct their investigation.  Defendant Cooke spent 27

14   years as a member of the Santa Clara Police Department.  He

15   left as a captain.

16           This was the type of crime that he himself might

17   have investigated as a Santa Clara police officer.  But

18   instead he was willing to subvert attempts by local police to

19   identify persons of interest involved in our harassment by

20   using his experience and contacts within law enforcement to

21   keep the Natick Police off track.  After eBay claimed it

22   conduct their own investigation with the cyberstalking

23   campaign in September of 2019, six of the defendants were

24   terminated.

25           EBay promoted defendant Cooke from senior manager

1   of eBay's global security to director.  What does that say

2   about the thoroughness of eBay's thorough investigation?

3   This case is about the culture of a company that promote and

4   rewards employees that break the law.

5       Defendant Cooke's employment was not terminated by

6   eBay until the charging document was made public in mid June

7   of 2020.  The cumulative effect of this operation has been

8   devastating to us.  But the most painful of this aspect of

9   this nightmare was to witness the effect it had on my wife

10  Ina.  To say she is the most important thing in my life is

11  not fully expressing it.  I know her heart, her moral

12  compass, her ethics, and her compassion.  She is simply the

13  best person I know.  And to see her targeted, terrorized and

14  traumatized was excruciating.

15      In the defendant's Cooke's sentencing memorandum,

16  the word remorseful was used three times.  He was remorseful

17  for his bad choices.  He was remorseful for conduct that for

18  an offer of 25 years got Gilbert into trouble.  He was

19  remorseful for misleading the Natick Police.  Nowhere in the

20  memorandum was there remorse for the pain, terror, and brutal

21  punishment he and the other defendants inflicted upon his

22  victims, my wife, and myself.

23      This was defendant Cooke's opportunity to express

24  to the Court that he has changed as a person, and he left out

25  the most obvious reason to believe that.

1          Being involved in a federal case is not easy for

2    any victim.  But as a journalist, it is an impossible

3    situation to be placed in.  Aside from the tremendous

4    physical, mental, and emotional damage that the defendant's

5    actions had on us personally, we also carry the burden of

6    maintaining the integrity of this investigation and not

7    influencing it with public comment.  But we understand that

8    this case extends far beyond Ina and myself.  It carries a

9    chilling message to journalists.

10          If corporations with limitless resources are

11   allowed to intimidate and threaten members of the media to

12   influence their reporting, it renders the First Amendment

13   virtually useless.  Defendant Cooke and his cohorts have also

14   done no favors to law enforcement.

15          In a particularly challenging time, the Natick

16   Police Department took our case seriously and made Ina and I

17   feel protected.  We were fortunate.  Defendant Cooke's

18   illegal contacts would shine a negative light on law

19   enforcement.  But these were his decisions, his acts done

20   with foresight, forethought and malice, and his sentence

21   should reflect that.  Thank you.

22          VICTIM 1:  Good afternoon, Your Honor.  My name is

23   Ina Steiner.  I'm Victim 1.  And thank you for letting us

24   speak.

25          THE COURT:  I want to remind you I have read your

1  victim impact statement.  I'm happy to hear anything you want
2  to add to that.  But --
3          VICTIM 1:  I'm sorry, Your Honor, but for two
4  years, we haven't been able to speak.
5          THE COURT:  Okay.  Your statement is longer than
6  your husband's, and I know he just read his.  Were you
7  intending on reading the whole statement?
8          VICTIM 1:  Yes, Your Honor.
9          THE COURT:  All right.  I have read it.  If that's
10  what you want to do, go ahead.
11          VICTIM 1:  Thank you, Your Honor.  When I learned
12  someone posing as my husband had ordered a pig fetus to be
13  delivered to my home, my heart sank.  It signaled that the
14  person who had been harassing me online was taking it to a
15  new, very disturbing level.  The profane, depraved threats
16  were disturbing and continued.
17          I began to be afraid that we would get swatted.  I
18  was distressed at having neighbors hand us packages they
19  received containing pornographic magazines sent to their
20  address in my husband's name.  How could one deeply disturbed
21  individual afford to send a $255 bereavement floral
22  arrangement.  This was not a run-of-the-mill Internet troll.
23  My feeling of dread intensified.
24          I froze my credit.  David bought additional
25  security cameras.  I grew watchful of strangers and began to

fear being in public by myself.  Seeing a delivery van drive
into my yard one day when I was home alone made me fearful
that our stalker would trick other local businesses into
making unwanted deliveries.  What if he had a company drop
off gravel or manure and instructed them to place it in a
driveway in front of our garage so our car would be trapped.
That evening a friend dropped off a spare car to place at the
head of our driveway to thwart any such attacks.  But as
David went to take our friend home, my fear turned to
paralyzing terror.  It was a real life nightmare.

I had remained at home, and I was watching the live
video on the new camera we had installed that day.  I watched
David pull out of our driveway in our car, then watched with
horror as a black van with New York plates with its
headlights on slowly began to follow at a distance.  It was
the same black van we had spotted earlier in the day driving
by our house.  It had caught our attention because we were on
high alert, and it looked out of place on our quiet little
one-way street.

I was sure they were following David with plans to
physically assault him.  But David had spotted the van.  He
did everything right.  And our 81-year old friend in the car
with him was able to get the license plate number, but it was
off by one digit leaving the police unable to determine the
identity of the driver.  After the police left it was dusk,

1    and we sat in the living room in shock.  David looked ill.

2    He was sweating and nauseous.  I feared he was having a heart

3    attack.  Compounding my fear of a potentially life

4    threatening health emergency was the terror that our stalker

5    was outside watching the house and would see an ambulance

6    take him away.

7         As I talked to him and tried to assess what to do,

8    I told him at least if we died, we'd have died doing

9    something we loved and believed in.  I believe that even if

10   our stalker was caught, I would be afraid of him for the rest

11   of my life.  Someone so obsessed with destroying us would

12   never stop I believed.  No longer fearing we were being

13   surveilled but actually knowing it turned my fear to panic.

14        David stood guard all night and he watched in

15   horror as a car pulled up in front of our house at 4:30 a.m.

16   A man got out.  He reached into the back seat.  He removed a

17   leather case.  We had been primed for fear.  The attacks were

18   meant to scare us, and they did.  We were terrified.  During

19   this period I began to feel pressure when breathing.  I laid

20   in bed at night afraid someone was going to break in.  When I

21   did sleep, I had nightmares.

22        I woke up with pain in my chest.  I lost weight.

23   Fears that I would be doxed were realized.  I was greatly

24   concerned for the safety of family members.  We cancelled

25   social engagements.  We were afraid to leave the house not

knowing what might be coming next out in the world or at our home.  I was afraid to leave my house.  But I didn't feel safe there either.

Several friends invited us to stay with them, but I was horrified at the thought of putting their lives in danger.  I was certain the perpetrator would follow us wherever we went.  After the Natick Police traced the car used in another tailing incident to eBay, they reached out to the company.  But then in a cruel twist, eBay doxed me.  After weeks of torture, I was devastated and terrified.  Would the attacks ever stop?  Would I are ever be safe?

The Natick Police and the FBI did get the online and real life attacks to stop, but I continued to dread going to the grocery store even though accompanied by David.  I eyed every shopper as a possible assailant.

One night as I was shutting off the lights before going upstairs stairs to join David, I thought with a pain, I don't know if I can ever be home alone at night again.  The fear didn't stop.  I was an avid walker, but I was afraid of cars coming up behind me and the people I encountered.  There were days when I crawled back into bed in the middle of the afternoon.  Some days I found myself crying.  Having to wait until June 15, 2020, to get answers from the government about who exactly was behind the attack was mental torture compounded by having to keep silent to preserve the integrity

1    of the criminal investigation, and later by the concerns that

2    the pandemic would hinder our search for answers and for

3    justice.

4           There's no way to mentally erase the trauma that we

5    sustained by having a cyberstalker and a real life stalker.

6    It's difficult to convey how life-changing the campaign of

7    terror sowed a deep distrust in me.  We continue to memorize

8    car license plates.  We keep the alarms on our doors.  I have

9    a golf club in my office to fend off any would-be attackers.

10   I still carry around pepper spray every single team I leave

11   the house.  There are days still when I feel an overwhelming

12   anxiety.

13          The attacks had an impact on my business.  The

14   government published some of the private messages exchanged

15   in 2019 between eBay's CEO Chief Communications Officer and

16   the head of eBay Safety and Security all referring to me.

17   Some of them were, "We're going to crush this lady; I'm not

18   f-ing around with her anymore; if you are ever going to take

19   her down, now is the time; I'll embrace managing any bad fall

20   out.  We need to stop her.  I want to see ashes as long as it

21   takes, whatever it takes."

22          A New York Times reporter profiled one of the

23   perpetrators in September of 2020 casting her as a victim and

24   making light of my continuing to do my job as a reporter

25   without recognizing the grit it requires me to keep going.

1    The Natick Police exposed Cooke's acts and his concealment of
2    them, but the outside world doesn't know how close our
3    stalkers came to succeeding.  I thought I would be physically
4    and emotionally incapable of sitting in front of my computer
5    or of communicating with anyone in the industry given the
6    level of distrust of the defendants, including the defendant
7    Cooke, sowed in my mind.

8          No matter who you are, there's one place that's
9    supposed to be safe -- home.  The people who attacked me took
10   that away from me.  Like everything else about this case, I
11   feel my life is laid bare, and I'll forever be linked to the
12   notoriety.  I am inextricably tied to eBay employees all the
13   way up to the CEO.  I worry that the perpetrators may profit
14   from their criminal acts against me and my husband, and I
15   hope the Court will take that into account when considering
16   conditions of probation and length of probation.

17         As a reporter I firmly believe in getting the story
18   out there.  But people who inserted such deep pain on my
19   husband and me should not profit from their crimes at our
20   expense.  Thank you, Your Honor.

21         THE COURT:  Thank you very much.  I know it's a
22   difficult thing to come here and make those kinds of
23   statements, and I appreciate it.  I appreciate it.
24   Mr. Cooke, your turn if you want to speak.

25         THE DEFENDANT:  Thank you, Your Honor.  Your Honor,

1    I know there's been some back and forth about legal points in

2    this case, and I very much appreciate all the help my

3    attorney has provided me.  But I don't think about this that

4    way any longer.  There's a simpler and more easy way to look

5    at this.  Something I completely failed to do back on

6    August 6.  And that is by asking a simple question about what

7    is right and what is wrong.

8             When looking at it from that simple ethical point

9    of view, it's crystal clear that this was all wrong from

10   start to fish.  I once heard a judge say there is no

11   acceptable level of violence.  He's 100 percent right.  In

12   this matter there is no acceptable level of violence or fear

13   that would be okay.  It was all simply wrong and nothing can

14   justify it.

15            The second question or another question is why.

16   And I simply took way too long to think about the victims.

17   And that's not an excuse, Your Honor.  It's a failure.  I

18   have thought about my CEO, my boss, my teammates.  I had

19   empathy for all the wrong people.

20            The crushing realization I ever felt when I was

21   talking to the lawyers about this case, I said something, it

22   wasn't a response to a question, it was just an awful

23   realization that nobody said something, nobody thought about

24   the Steiners.  I spent my whole adult life [technical issue]

25   one more time for them, I failed.  And I failed miserably.  I

1    let a twisted sense of loyalty to all the wrong people

2    override the needs of the only people that really mattered,

3    the victims.  For that I am truly sorry and disgusted with

4    myself.

5            I used to think this case was complicated and felt

6    for those that had to piece it all together.  It's not

7    complicated at all.  It's simple.  What happened is a group

8    of people got together and immorally and illegally

9    rationalized and justified horrific behavior in order to

10   please the boss.  That's disgusting.  That's not who I am.

11   But that's what I did.  And no words could ever make up for

12   that.

13           I bent all that I stood for because I did not have

14   the strength to do what was right.  The only right answer was

15   to throw a fit after the August 6 meeting and do everything

16   in my power to stop what ultimately occurred.  Instead I ran

17   away and abandoned my responsibility to be a good person, to

18   stick up for people in need.

19           That realization is again the most devastating

20   thing I've ever felt.  I know it's too late to change my

21   actions.  So I have nothing to say except I'm sorry.  I would

22   do anything to change my behavior if I could.  I hurt plenty

23   of others as well.  Before I address them, I need to make a

24   statement in regards to eBay.  EBay is actually a great

25   company filled with wonderful people who do good work

providing a way for small businesses to operate in a global
economy.  My failures hurt them very much as well and they
did not deserve that.

I am truly sorry for the grief I caused them and
wish I could go back in time.  But again I'm left with the
only thing I can do now and that is to say I'm sorry.

To the Santa Clara Police Department, an agency
filled with wonderful, dedicated people, I am so sorry.  Even
though I was retired, my obligation to live a good life for
them was a lifelong commitment, and I failed them miserably
as well.  I created horrible negative press that hurt them
badly, and they did not deserve that.

Like the victims they made me think about others
and act accordingly, something I simply did not do.  And I'm
very sorry.  To the Natick Police I put my own selfish
desires above you.  There is no excuse for that.  Again, I
failed you.  I know my words do not change the choices I made
and the grief I caused you.  There is no excuse for it.

I cared deeply for my friends and I didn't want
anyone to be in trouble.  That's pathetic and feeble.  I
should have known better and I do know better than to
selfishly place wrong over right, the same failure as I had
on August 6.  And for that I'm very sorry.  I also let down
and betrayed the good cops around the country who did not
need another stain on the profession.  I never thought I

1    would be that guy.  But I am and I did.  I'm so disgusted

2    with myself for it.  I'm very sorry for my conduct and awful

3    decisions.  I just wish there was more I could do except to

4    say I'm sorry.

5            To my family that always stood by me and still do.

6    You did not deserve the shame I brought to you.  I made it

7    through many years in life with your help.  I was safe now.

8    It was supposed to be the good times, not this.  I'm very

9    sorry for what I did to you and the pain I caused especially

10   to my wife, children, and mother.

11           Your Honor, I know my eBay friends are not victims.

12   I know that very clearly.  But I let them down, too.

13   Especially Ronnie Zea and Stephanie Stockwell.  I'm not

14   blaming the others for what I did and I hold myself

15   responsible for my own actions.  I look at those young people

16   differently.  They're young, wonderful women who trusted the

17   adults in their lives.  We had an obligation to safeguard

18   them.  And my failure to act appropriately on August 6 let

19   them down immensely.  For that I'm very sorry.

20           To the victims, the most important people of all of

21   this.  There are no words I can come up with to express how

22   sorry I am.  I have failed you and allowed you to be

23   victimized.  I spent years protecting people but failed to do

24   that for you.  I am so very sorry.  That is not who I am or

25   how I live my life.  But that is how I did.  I can't ask you

1    to forgive me.  That's inappropriate.  I can't ask you for

2    anything.  I just sincerely hope that everyone who played a

3    part in hurting you is held accountable and that you can put

4    this behind you and once again enjoy the peace in your home

5    that you deserve and that we took from you.  Doing that to

6    you will forever haunt me.  It's shameful.  It's awful.  I'm

7    very sorry that any of this happened to you.  I wish I could

8    change this for you.  I really do.  I'm just sorry that I

9    can't.

10          And lastly, I just need to thank the Court for the

11   counseling that was ordered when I pled guilty last year.  No

12   one deserves to benefit from criminal behavior, but that was

13   a gift, Your Honor.  Actually everyone I've dealt with

14   through this process from the Marshals to U.S. Probation to

15   the U.S. Attorney's Office was extremely professional, kind,

16   polite, patient.  And I did not deserve that.

17          It really highlights the guilt I feel for not only

18   betraying the victims on August 6 but for betraying the

19   criminal justice world I was once so proud to be a part of.

20   Thank you.

21          THE COURT:  All right.  I want to thank you all for

22   your participation in this proceeding.  I am sure it goes

23   without saying that this is not an easy decision to make.

24   There are real life victims in this case.  I need to take

25   into account what they have suffered through.  I also have a

1    defendant who has fundamentally led a very good life, who was

2    involved for reasons I will never understand in conduct that

3    is just nuts.  The idea of all of these grown people sitting

4    around a table coming up with this plan is almost

5    unfathomable to me.  I'm not sure if I saw it on television

6    if I would actually find it to be believable.

7           So the conduct, as Mr. Cooke certainly knows, was

8    not good.  And when I say not good, I mean extremely not

9    good.  And I am also cognizant of the fact that there's a lot

10   of defendants coming behind you, and I am the first one

11   taking a look at these facts.  I am aware of that as well.

12   It's a difficult situation.

13          I am thinking about this, and I've thought about it

14   long and hard.  I don't mean to set a precedent for the

15   defendants coming after.  I think Mr. Cooke is in a different

16   situation than many of the other people that are involved in

17   this.  I think the government is correct to recognize that

18   although he really didn't qualify for a role reduction under

19   the guidelines, that his role was different than that of many

20   other people in the case.  And the government's

21   recommendation in this case was certainly reasonable.

22          I also think about Mr. Cooke, and I've listened to

23   him here today, and I've read the letters on his behalf which

24   were in some ways very exceptional.  And I think about the

25   fact that again although he does not actually qualify under

1   the guidelines, I don't think that the behavior was aberrant.

2   He has health issues.  His rehabilitation has been admirable.

3   And I agree with a lot of things that Ms. Winkler said,

4   although not all of them.

5           I'm not buying into what was reasonably foreseeable

6   to him because it was reasonably foreseeable to him on day

7   one really doesn't inform what happened afterwards.  But that

8   being said, he left the first meeting early.  He didn't

9   attend the second meeting.  He removed himself from the

10  situation.  He says he ran away or he hid.  He certainly did

11  not withdraw from the conspiracy, but he did distance himself

12  from it in a way.  He didn't visit the victim's house.

13          I don't want to use alcoholism as an excuse, but

14  when somebody who is drunk sends a thumbs up sign, I'm not

15  really sure what that means.  Which is not to say that it is

16  acceptable or good conduct, but -- So anyway, in thinking

17  about the appropriate sentence, I have considered, as I need

18  to consider the advisory guideline sentencing range, the

19  nature and circumstances of the crimes at issue here, the

20  defendant's personal characteristics, his criminal history or

21  in this case lack thereof, and then the institutional

22  concerns which is the need for the sentence to reflect the

23  seriousness of the offense, promote respect for the law, just

24  punishment, and adequate general and specific deterrence and

25  all the other factors under 18 U.S.C. 3553(a).

1          I do agree with Ms. Winkler that specific
2    deterrence in this case are unnecessary.  I very much doubt
3    we will see this defendant here or involved in the criminal
4    justice system again.  There does need to be a strong general
5    deterrent message.
6          Ms. Winkler is right in many many respects what's
7    already happened has served as a deterrent message I'm sure.
8    There's obviously a civil case pending and that has a
9    potential to have some serious financial consequences which
10   will provide other deterrence especially for a corporation
11   where I think that money is very much the bottom line.
12         So I have wrestled with this.  I don't think it's
13   an easy situation.  As I say, the defendant is a
14   fundamentally good man who has participated in a horrible
15   offense that really victimized some very undeserving victims.
16   As is often the position from here, I am going to make nobody
17   happy.  And I hope that the making of no one happy suggests
18   that I have found some measure of the right place to be.
19         So pursuant to the Sentencing Reform Act of 1984
20   and having considered the sentencing factors enumerated at 18
21   U.S.C. 3553(a), it is the judgment of the Court that the
22   defendant Philip Cooke is hereby committed to the custody of
23   Bureau of Prisons to be in prison for a term of 18 months.
24   That is 18 months on each count to be served concurrently.  I
25   don't know that that's long enough for him to participate in

1     the RDAP program.  If it is, I would like him to participate

2     in that.  If he can get himself into that, that may allow him

3     to participate in the Bureau of Prisons alternative community

4     placement program which would let him transition to a

5     treatment setting as an alternative to residential re-entry

6     center.

7           I am going to place him on a term of supervised

8     release for three years.  That is three years on each count

9     to run concurrently.  Within 72 hours of release from

10    custody, the defendant shall report in person to the district

11    in which he is released.  There has been no request for

12    restitution, and I therefore am not going to order

13    restitution.

14          While under the probation office's supervision, the

15    defendant shall comply with the following terms and

16    conditions.  Some of these are mandatory.  The mandatory ones

17    include:  You must not commit another federal, state, or

18    local crime.  You must not possess a controlled substance.  I

19    am not going to impose drug testing conditions, but he will

20    have to cooperate in the collection of a DNA sample.  Plus

21    any other standard conditions that are adopted by the Court.

22          I am also going to impose the following special

23    conditions:  And there are a bunch of these, and some of them

24    I am making up as I go.  So you will correct me if I need to

25    temper them in any way.

1          You may not have any contact, direct or indirect,

2     with the victims unless it is initiated by them.  You are

3     prohibited from drinking alcohol to the point of

4     intoxication, which at this point is defined in Massachusetts

5     state law as .10 -- I think .08.

6              THE PROBATION OFFICER:  I think .08 is for driving.

7              THE COURT:  .10 alcohol level.  I'm not going set

8     you up for failure by prohibiting drinking, which I know is

9     what you've been doing.  That's fine.  I don't want you out

10    on the streets drunk.  As I tell everyone in your situation,

11    if you feel the need to get drunk, I suggest you do it alone

12    in your basement.  Participate in a mental health treatment

13    program as directed by the probation office, and you'll

14    contribute to the cost, evaluation, treatment, and

15    programming if you can afford it.  If you can't, that's all

16    right, too.

17          I'm going to impose the $15,000 fine requested by

18    the government.  No new credit charges or open additional

19    lines of credit without the approval of probation until that

20    fine is satisfied.  While that fine is pending, you'll

21    provide to the probation office any financial information

22    that they need.

23          I am also going to impose following 18 months of

24    incarceration as a special condition of your supervised

25    release that you spend 12 months on home confinement.  What I

1   mean by home confinement, I'm going to make it simple for

2   you.  You're not supposed to be doing anything fun.  You can

3   work.  You can volunteer.  You can go to your medical

4   appointments.  You can do your religious stuff.  But no

5   dinners, no vacations.  Nothing like that.

6           That Mr. Kosta adds up to the 30 months that you

7   asked for, although not quite in the form you asked for.  18

8   months incarceration, 12 months home confinement.

9           I imposed the $15,000 fine.  I am also going to

10   order 100 hours of community service which I think is

11   something you might be inclined to do anyway.  I'm going to

12   make that part of your sentence.  That's 100 hours.  I impose

13   three years of supervised release because I want him

14   supervised until the community service, the one year of home

15   confinement, and the fine are satisfied.  Once those things

16   are satisfied, and if he has been behaving himself and you

17   want to ask that that period of supervised release be

18   terminated early, I will be amenable to that.  But I want him

19   supervised while the obligations are pending in the case.

20           Lastly, a special assessment of $200 which shall be

21   due immediately.  You have your rights to appeal such as they

22   are.  And I'm sure Ms. Winkler will help you with that if you

23   want to appeal what I've done here today.  You can speak to

24   my Deputy Clerk Karen.  I suspect Ms. Winkler is going to ask

25   for a recommendation of incarceration close to where his

1    family is.  It's my experience that that and three dollars

2    will get you a cup of coffee.  I'll make the recommendation

3    that he be held as close to home as possible so that his

4    family can have access to him.  Be that California or

5    Massachusetts, wherever you decide your home is.  What have I

6    forgotten?

7              THE PROBATION OFFICER:  Your Honor, I would ask

8    that it be home detention as opposed to home confinement with

9    the need to leave for community service and things like that.

10   It would be easier.

11             THE COURT:  That's fine.  Done.  Mr. Kosta?

12             MR. KOSTA:  I owe a clarification to the Court.

13   The government's plea agreement committed to a recommendation

14   of 12 months supervised release based on the specific

15   deterrent factors.  I apologize to Ms. Winkler for not

16   raising it earlier.  The horse left the barn.  I just wanted

17   to be clear our recommendation was 12.

18             THE COURT:  I know what your recommendation was.

19   To tell you the truth, I would have given a higher fine

20   except that if I abided by your recommendation, I know

21   there's a civil suit pending.  I understand what your

22   recommendation is.  I thought about it independently.  I do

23   think that a year of supervised release is enough for him.  I

24   don't think there's a need for specific deterrence.  I want

25   him supervised until the fine is paid, the community service

1   is done, and the 12 months of home detention.  I would like

2   him supervised until that's over.  Once those things are

3   successfully completed, you or her or them can ask for it to

4   be terminated.  I just want to keep track of him while the

5   obligations are pending.  Anything else from you, Mr. Kosta?

6           MR. KOSTA:  No, Your Honor.  Thank you for your

7   time.

8           MS. WINKLER:  No, Your Honor.

9           THE COURT:  You're amenable to self reporting?

10          MR. KOSTA:  Yes, Your Honor.

11          THE COURT:  We'll come up with a date for that.

12  Mr. Cooke, I feel for the victims in this case.  I really

13  really do.  And I know that you do, too.  And what they were

14  put through was really unfathomable.  I heard your statement.

15  Some day it would be interesting to have a better

16  understanding of what exactly you could have been thinking

17  when you engaged in this.

18          All of that being said, I feel for you, too,

19  because you're so lucky in so many ways and you've led such a

20  good life in so many ways, people that love you and family

21  that supports you.  You will do your time on this and you

22  will be punished.  A police officer in prison is never an

23  easy situation.  I appreciate what you're about to go through

24  particularly during COVID.  You will come out and you will

25  get to the other side of this, and you will be okay.  A lot

1    of people I expect to see again on supervised release.  I

2    don't expect that you and I will ever cross paths again.  I'm

3    going to tell you now it is my fervent hope that you get

4    through this, get past it and get back to living the better

5    life that you are clearly capable of.  And again I think

6    you're lucky because there are so many people that love you

7    and support you and will help you make that happen.

8           If there's nothing else, I'm going to recess the

9    case.  Anything?  Case is recessed.  Self report date.

10   Sorry.  What do you think?

11          THE PROBATION OFFICER:  I believe it's still been

12   six weeks, Your Honor.  I defer to counsel.

13          THE COURT:  Six weeks.

14          MR. KOSTA:  Yes.

15          MS. WINKLER:  Yes, that's fine.

16          THE COURT:  I'm intending for him to self report.

17   If there's not a designation within the six weeks, come back

18   and we will straighten that out.

19          THE CLERK:  September 7.

20          THE COURT:  September 7.  Thanks, everyone.  The

21   case is recessed.

22          (Court recessed at 12:20 p.m.)

23

24

25

```
 1                  - - - - - - - - - - -

 2                       CERTIFICATION

 3

 4        I certify that the foregoing is a correct

 5   transcript of the record of proceedings in the above-entitled

 6   matter to the best of my skill and ability.

 7

 8

 9

10   /s/ Joan M. Daly                    August 18, 2021

11

12   _____         _____

13   Joan M. Daly, RMR, CRR              Date
     Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```