UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>      Plaintiff,<br><br>v.<br><br><br><br><br>PHILIP COOKE,<br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CASE No.: 1:20-CR-10126-ADB |

**DEFENDANT PHILIP COOKE'S MEMORANDUM
IN SUPPORT OF MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i) (COMPASSIONATE-RELEASE)**

The defendant, Philip Cooke, respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to reduce the remainder of his sentence to time served and allow him to serve the remainder of his original incarcerative sentence in home confinement. As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons. Mr. Cooke is 57 years old and suffers from multiple complex cardiac issues including but not limited to coronary artery disease, hypertension, and atrial fibrillation, as well as a chronic liver disease. Under the CDC guidelines, these multiple conditions place Mr. Cooke at significant risk of becoming seriously ill from Covid-19, including the risk of hospitalization and death despite his immunization status. Sheridan has recently experienced its largest ever outbreak of COVID-19. As a result of efforts to deal with the pandemic, conditions at Sheridan have been particularly harsh during Mr. Cooke's confinement with inadequate access to medical care, lack of adequate sanitation, lack of programming, and isolation and stress from unpredictable lockdowns and quarantines. As a result, Mr. Cooke's incarceration has been far harsher and restrictive than in normal circumstances, and specifically because of his BOP placement in Sheridan.

1

Of note, the Warden and prison medical office at Sheridan approved Mr. Cooke for release to home confinement, effective June 23, which decision was overturned by the Regional Medical Officer, Brian McDonough, who concluded Mr. Cooke did not meet the cardiac risk factors in the CDC guidelines. That decision was clearly erroneous as demonstrated by Mr. Cooke's medical records discussed below. Additionally, the conditions at Sheridan limit Mr. Cooke's ability to undertake self-care. Especially where, as here, Mr. Cooke is at no risk of re-offending and is no danger to the community, compassionate release to home confinement for the remainder of his incarcerative sentence is justified by extraordinary and compelling reasons, and such a result would be fair and just under 18 USC 3553(a).

## **PROCEDURAL HISTORY**

Mr. Cooke is currently serving an 18-month sentence for conspiracy to commit cyberstalking and witness tampering. On July 6, 2020, he entered into a pre-indictment plea agreement with the U.S. Attorney's Office, and he pled guilty on October 27, 2020. He was released on his own recognizance and complied with all conditions of release. He was sentenced by this Court on July 22, 2021, to an 18-month incarcerative sentence, to be followed by three years of supervised release, with the first 12 months in home confinement. Thereafter, BOP assigned him to Sheridan Correctional Facility outside Portland, Oregon, and he voluntarily reported as directed by the Court on September 7, 2021. He will have served 50% of his sentence by approximately June 7, 2022.

In late January 2022, Mr. Cooke obtained an approved pre-release plan from U.S. Probation in the Northern District of California to reside with his wife at their family home in San Jose, California.[1]

---

[1] On October 6, 2021, Sheridan submitted a pre-release plan for Mr. Cooke to U.S. Probation (USPS) in the Northern District of California (NDCA), which plan was to reside with his wife, Deborah Rothschild, at their family home in San Jose, California. On November 16, 2021,

2

On or about March 8, 2022, Mr. Cooke submitted a CARES Act request for compassionate release to the Warden. (Ex. 1). Initially, the Warden and local medical office at Sheridan approved his release to home confinement and set an anticipated release date of June 23, 2022 (Ex. 2, see "REMARKS" section, which indicates that his anticipated release date as June 23, 2022). That date represented 9 months of incarceration plus two weeks of quarantine before release – or 50% of Mr. Cooke's incarcerative sentence – in keeping with the BOP guidance that 50% of an incarcerative sentence should be served before release. *See*, (Ex. 6: 4/13/2021 BOP memorandum). On or about March 15, 2022, Mr. Cooke's Case Manager at Sheridan communicated to him the Warden's approval of his release to home confinement along with the anticipated release date of June 23, 2022.

On or about April 11, 2022, the BOP Regional Medical Officer, Brian McDonough, M.D., overturned the Warden and reversed the decision to release Mr. Cooke to home confinement. At Mr. Cooke's request for a written explanation, his Case Manager provided him an answer by copying the portion of Dr. McDonough's email where Dr. McDonough explained to Sheridan that he was denying the request because didn't believe Mr. Cooke met the relevant CDC guidelines for increased risk of serious Covid-19 illness due to cardiovascular risk factors: Heart conditions (such as heart failure, coronary artery disease, cardiomyopathy, or hypertension." (Ex. 3). In fact, Mr. Cooke's medical records document multiple medical

---

USPS of NDCA denied the plan because the supervised release conditions imposed by this Court were not as strict as the ones that USPS in NDCA wanted. In particular, USPS in NDCA required location monitoring, something this Court did not impose in this Defendant's case at the time of sentencing. On December 10, 2021, Mr. Cooke filed a motion to add the more strict supervision conditions so that USPS in NDCA would accept the transfer of supervision, allow him to return to his family home with his wife for the period of home detention, and avoid the dislocation and expense of an alternative release to Massachusetts. The Court allowed the motion on January 11, 2022 (Docket No. 31). Soon thereafter, USPS in NDCA updated their position, approved his pre-release plan, and accepted transfer of supervision to that District.

conditions that, under CDC guidance, put him at higher risk of serious Covid-19 illness including hypertension, coronary artery disease, and fatty liver disease.

## ARGUMENT

I. **This Motion is Ripe for Review Because 30 Days Have Passed Since Mr. Cooke Submitted His Request to the Warden for Compassionate Release and the Bureau of Prisons Has Not Brought a Motion on His Behalf.**

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of BOP, Congress expanded the statute in the First Step Act of 2018. Pub. L. No. 115-391, 603(b), 132 Stat. 5194, 5239 (December 21, 2018). As amended, Section § 3582(c)(1)(A)(i) now permits courts to consider motions filed by the defendant so long as the "defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

Mr. Cooke reports having provided his written request to the Warden on or about March 8, 2022. Other than the response from his Case Manager, Mr. Cooke never received a written denial or statement of reasons from Dr. McDonough, or any other BOP official, as contemplated by the CARES Act and its implementing regulations.[2] As more than 30 days have passed since the submission of Mr. Cooke's request to the Warden, and no motion has been brought by BOP, Mr. Cooke's motion is ripe for consideration.

---

[2] The implementing regulations for the CARES Act, 28 CFR § 571.60, *et. seq.*, specify no role for the Regional Medical Officer in making decisions on requests for Compassionate Release, instead specifying that after the Warden makes his decision, the decision goes to the Office of General Counsel, the Medical Director or Assistant Director of the Correctional Programs Division, and ultimately to the Director, Bureau of Prisons. *See*, 28 CFR 5§ 71.62. According to Mr. Cooke's case manager, Sheridan views Dr. McDonough's position as final. No written declination with a statement of reasons was received by Mr. Cooke from Dr. McDonough, the Warden, the General Counsel, or the Director. *See,* 28 CFR § 571.63.

If more is needed, the First Circuit has held the exhaustion requirement is not jurisdictional, but a non-jurisdictional claims processing rule. *United States v. Texeira-Nieves*, 23 F.4th 48, 53 (2022). If this Court were to decide that the communication from Mr. Cooke's Case Manager constitutes a written denial containing a statement of reasons that suffices to comport with the statutory and regulatory requirements, Mr. Cooke expressly requests that any requirement for further administrative appeal be waived. *See, e.g., United States v. Ramirez,* 459 F.Supp.3d 333, 342-43 (2020), and cases cited therein. As grounds for such waiver, as discussed below, Mr. Cooke believes that his documented medical conditions, together with Sheridan's inability to cope with Covid-19 and the unusually harsh conditions which have resulted from their efforts justify the Court considering this motion without additional delay.

**II.     Mr. Cooke's Multiple Serious Medical Conditions, in the Context of Extraordinary Conditions of Lockdowns, Quarantines, and Disruption of Medical Care During the Coronavirus Pandemic, Establish Extraordinary and Compelling Reasons for Compassionate Release.**

The First Circuit set forth the standards for review of a prisoner's compassionate release motion in *U.S. v. Ruvalcaba,* 26 F.4th 14 (2022). In pertinent part, the Court explained:

> Section 3582(c)(1)(A) authorizes a court to reduce a term of imprisonment when "extraordinary and compelling reasons warrant such a reduction." A prisoner seeking such relief may file a motion after exhausting his administrative remedies. [citations omitted]. To grant the motion, the district court must find both that the defendant has presented an "extraordinary and compelling" reason warranting a sentence reduction, [citation omitted], and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. [citation omitted]. In addition, the district court must consider any applicable section 3553(a) factors . . and "determine whether, in its discretion, the reduction … is warranted in whole or in part under the particular circumstances of the case. [citations omitted].

*Id.* at 18-19. The Court further held that "a district court is not constrained by the existing policy statement [by the Sentencing Commission] on compassionate release when adjudicating a motion brought by a prisoner," in essence because the Commission has not issued a policy statement on compassionate release following the enactment of the First Step Act due in whole

5

or in part to a lack of quorum. *Id.* at 21. While not binding, the Sentencing Commission's current policy statement may serve as a non-binding reference. *Ravulcaba*, at 23.[3]

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction. The First Circuit noted in *United States v. Canales-Ramos*, 19 F.4th 561, 566 (1st Cir. 2021) that "the 'extraordinary and compelling' standard is logically guided by the plain meaning of those terms." Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," and "compelling need" as one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." As the Eastern District of Pennsylvania has recognized, "nothing could be more extraordinary and compelling than this pandemic," least of all for those, like Mr. Cooke, whose medical conditions limit their ability to provide self-care in a fundamental way. *United States v. Adeyemi*, 2020 WL 3642478 (E.D.Penn. July 6, 2020).

Conditions justifying release are also described in directions given by the Attorney General to the BOP, and BOP to their staff. On or about March 26, 2020, the Office of the United States Attorney General issued a Memorandum to the Bureau of Prisons requiring the use of home confinement in appropriate cases by identifying high risk individuals at risk for COVID and moving them out of the institutional setting. In this context, this inquiry includes, in relevant part, (1) emphasis on inmates who are vulnerable to contracting Covid in prison based on their medical history, (2) giving priority to those who are located in low and minimum security facilities, (3) allowing deference to those who are scored as a minimum risk and, (4) giving priority to those inmates whose release would lower their individual risk of contracting Covid.

---

[3] Potentially pertinent here is the United States Sentencing Commission's directive in its policy statement in U.S.S.G. § 1B1.13, Application Note 1, applicable to § 3582(c)(1)(A) sentence reductions, that requires a court to determine that "extraordinary and compelling reasons" justify a 18 U.S.C. § 3582(c)(1)(A) reduction, where he suffers from a "serious ... medical condition ... that substantially diminishes his ability to provide self-care".

(Ex. 4). This memorandum was subsequently clarified by the Attorney General's Office on April 3, 2020, requiring the BOP to immediately prioritize home confinement as an appropriate response to the current pandemic. (Ex. 5). In the April 3 Memorandum, the Attorney General also advised the BOP to immediately process suitable candidates out of the prison setting as soon as possible. As indicated above, on April 13, 2021, BOP issued a memorandum superseding its prior guidance that set forth the factors to be considered, including pertinent to this case, "reviewing the Covid-19 vulnerability of the inmate in accordance with CDC guidelines," and "confirming the inmate has served 50%or more of their sentence…." (Ex. 6).

- A. *Mr. Cooke's Serious Health Conditions Make Him Vulnerable to Serious Illness or Death From Covid-19 While in Prison Despite his Vaccination Status Where He is Unable to Undertake Self-Care.*

Mr. Cooke's serious medical conditions, which include hypertension, coronary artery disease, atrial fibrillation, and fatty liver disease, among others, elevate his susceptibility to severe illness and complications from COVID-19. As demonstrated by Mr. Cooke's medical records, Dr. McDonough conclusion that Mr. Cooke did not meet the CDC guidelines for medical conditions that put people at greater risk from COVID-19 was clearly erroneous.[4] The CDC states: "Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get very sick from COVID-19." People with Certain Medical Conditions | CDC (last accessed May 19, 2022). The CDC specifically notes that the list does not include all possible conditions with increased risk, and that the risks are not listed in order of the most serious. *Id.*

---

[4] From the clearly erroneous findings, it appears that Dr. McDonough either did not have or did not review Mr. Cooke's medical records at the time he made his decision. Hypertension is the first listed condition in Mr. Cooke's medical summary from Kaiser, provided as part of his request to the Warden.

By way of overview, Mr. Cooke is fifty-seven [57] years-old. According to the CDC, based on his age alone, and not considering his incarceration, the Defendant is considered to be at a 3X higher risk for hospitalization and 25X higher risk of death as a result of contracting COVID-19 than the reference group. https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html. (Updated April 29, 2022; last accessed May 19, 2022). Significantly, he suffers from two of the four specified cardiac conditions in the CDC's guidance that result in specifically higher risk of hospitalization and death (hypertension and coronary artery disease), as well as additional dangerous cardiac conditions (atrial fibrillation, HDL deficiency, and hypertriglyceridemia), and fatty liver disease.

**(1)     CDC Guidance – Hypertension**

Throughout Mr. Cooke's medical records, he is diagnosed with hypertension, including as the *very first condition listed* in the Kaiser summary of his conditions. (Ex. 7)(Ex. 7 will be filed after consideration of the assented-to motion to file them under seal). Mr. Cooke's medical records were previously obtained in their entirety by USPS for the PSR, and also provided to the Warden on a thumbdrive together with the Cares Act request. Those records include multiple references to his hypertension. (Ex. 7, selected pages from Mr. Cooke's medical record). Hypertension is one of four conditions the CDC expressly links to more severe outcomes from Covid 19 in its published guidance, and under the CDC guidance should have been enough to qualify Mr. Cooke as having a condition that justifies early release to home confinement under the 4/13/21 BOP memorandum.

The seriousness of hypertension for Mr. Cooke is not hypothetical. He has been prescribed Tenormin in order to keep his pulse down. Without this medication Mr. Cooke's pulse rate slowly rises to dangerous levels, which also causes a heart rhythm issue. In 2013, when Mr. Cooke was first released from the hospital after contracting an infection in his heart, and was not

8

prescribed this medication, he ultimately was admitted to the intensive care unit because his resting pulse rate rose to over 200 bpm and was well out of normal rhythm, all of which is documented in his medical records. (Ex. 7).

    **(2)**    **CDC Guidance – Coronary Artery Disease**

Mr. Cooke's medical records also demonstrate coronary artery disease. His physician at Kaiser initiated a coronary calcium scan for Mr. Cooke to diagnose coronary artery disease. See, Ex 7 (Kaiser's information on coronary calcium scans). The results showing the beginning of such disease resulted in Mr. Cooke's physicians recommending statins and that he follow an ASA 81 mg low glycemic mediterranean diet. He was also asked to consider fish oil (High TG) supplements, weight loss, and exercise." Ex. 7. While incarcerated at Sheridan, Mr. Cooke cannot engage in effective self-care by following the recommendations of his physician because of prison meals and regular lockdowns and quarantines that make him unable to control his diet and exercise regimens.

In addition to the calcium scan demonstrating coronary artery disease (CAD), Mr. Cooke has also been diagnosed with HDL deficiency. (Ex. 7). HDL deficiency is a rare genetic condition that causes low levels of "good" cholesterol (HDL) in the blood and worsens CAD. *See, e.g.* https://rarediseases.info.nih.gov/diseases/2872/familial-hdl-deficiency; https://medlineplus.gov/genetics/condition/familial-hdl-deficiency/ As noted by the NIH and on Medline, people with familial HDL deficiency may develop cardiovascular disease at a relatively young age, often before age 50. *Id.*

Further, Mr. Cooke has also been diagnosed with hypertriglyceridemia which is an abnormal concentration of triglyceride in the blood. (Ex. 7). A systemic review and meta-analysis by M.H. Murad and A. Coto-Yglesias, published in *BMC Endocr Disord* 12, 2 (2012), concludes that Hypertriglyceridemia is directly associated with an increased risk of

cardiovascular events and acute pancreatitis. "The current evidence suggests that fasting hypertriglyceridemia is associated with increased risk of cardiovascular death, MI, cardiovascular events, and possibly acute pancreatitis."

https://bmcendocrdisord.biomedcentral.com/articles/10.1186/1472-6823-12-2.  Both the associated cardiovascular events and pancreatitis are on the list of medical conditions the CDC guidance indicates contain an increased risk of serious outcomes from infection with Covid-19.

    **(3)    Additional Serious Cardiac Condition:  Atrial Fibrillation**

Another cardiac-related condition with which Mr. Cooke is diagnosed is atrial fibrillation [A-fib] which began when he contracted a serious virus that infected his heart several years ago. *See,* Ex. 7. Atrial fibrillation is an irregular and often very rapid heart rhythm [arrhythmia] that can lead to blood clots in the heart.  https://www.cdc.gov/heartdisease/atrial_fibrillation.htm. This condition has caused Mr. Cooke to be susceptible to pericardial effusion, a buildup of extra fluid in the space around the heart which can prevent the heart from pumping normally.  This condition resulted in Mr. Cooke being rushed to the emergency room several times, including once when he was admitted to the intensive care unit.  On October 13, 2021, the NIH published a meta-analysis that concluded atrial fibrillation is independently associated with severe outcomes from Covid-19.  The study concluded:

> AF is quite common among hospitalized patients with COVID-19, particularly among older patients (≥60 years of age), North American and European patients, and patients with severe COVID-19. Moreover, AF and new-onset AF were independently associated with an increased risk of all-cause mortality among hospitalized patients with COVID-19. Our results should be confirmed by further well-designed, prospective studies.

https://pubmed.ncbi.nlm.nih.gov/33601308/.

Taken together, Mr. Cooke's cardiac related conditions put him at high risk of serious complications or death if he contracts Covid-19 while in prison.  Dr. McDonough was incorrect when he said in his email to the Case Manager that Mr. Cooke did not have cardiac risk factors

10

under the CDC guidance.  He has both hypertension or coronary artery disease.  When those conditions are considered together with his atrial fibrillation, HDL deficiency, and hypertriglyceridemia, his risks of serious outcomes from Covid-19 due to cardiac risks are compounded.

### (4) Fatty Liver Disease

Mr. Cooke has also been diagnosed with Hepatic steatosis, [known as Fatty liver] as well as abnormal liver enzymes. (Ex. 7). Hepatic steatosis occurs when fat builds up in the liver which can affect liver function and cause liver failure.  The CDC lists chronic liver disease, including non-alcoholic fatty liver disease, as increasing the risks of serious outcomes from Covid-19.  People with Certain Medical Conditions | CDC (last accessed May 19, 2022).  As the Mayo Clinic further explains the mechanism of risk, some individuals with NAFLD can develop nonalcoholic steatohepatitis (NASH), an aggressive form of fatty liver disease, which is marked by liver inflammation and may progress to advanced scarring (cirrhosis) and liver failure. This damage is similar to the damage caused by heavy alcohol use.

https://www.mayoclinic.org/diseases-conditions/nonalcoholic-fatty-liver-disease/symptoms-causes/syc-20354567

### (5) Immunizations and breakthrough cases.

Mr. Cooke was immunized for COVID-19 prior to reporting to Sheridan and reports receiving one booster while at the facility.  According to the CDC, those immunizations do not prevent breakthrough cases, and are not 100% effective.  Vaccine Breakthrough Infections: The Possibility of Getting COVID-19 after Getting Vaccinated (cdc.gov) (last accessed May 19, 2022).  As explained by the Court in United States v. Valencia-Lopez, No. 05-CR-841 (NGG), 2022 WL 198604, at *3 (E.D.N.Y. Jan. 21, 2022), the COVID-19 landscape has changed dramatically within the past month alone as the current surge, driven by the Omicron and Delta

11

VOCs. The rapid spread of these highly transmissible VOCs has resulted in higher rates of breakthrough infections generally, with prison and immunocompromised populations increasingly susceptible to those breakthrough cases. *See, e.g., United States v. Brunetti*, No. 01-cr-257 (JFK), 2022 WL 92753, at *4 (S.D.N.Y. Jan. 10, 2022) ("In light of the rapid spread of the Omicron variant and its partial resistance to the COVID-19 vaccines, the Court ... concludes that [movant] has established that extraordinary and compelling circumstances' support his release."); *United States v. Johnson*, No. 98-cr-860-7 (ARR), 2021 WL 5755047, at *4 (E.D.N.Y. Dec. 3, 2021) ("The risk of breakthrough infection is greater among incarcerated individuals than members of the general public."); *United States v. Bradshaw*, 96-cr-10032-DPW (D. Mass. March 4, 2020)(Granting compassionate release to defendant who had received both Moderna vaccine doses); *United States v. Murakami*, 17-cr-10346-DPW (D. Mass. February 25, 2021)(granting compassionate release to hypertensive defendant who had received one dose of the vaccine, and would receive second dose prior to release); *United States v. Reyes*, No. 11-cr-1, 2021 U.S. Dist. LEXIS 99864, at *6, 2021 WL 2154714 (D. Conn. May 26, 2021) (granting compassionate release for fully vaccinated movant where "newly available data describe 'breakthrough infections' caused by COVID variants in vaccinated populations"). *United States v. Sweet,* 07-20369, 2021 WL 1430836 (E.D. Mich. April 15, 2021)(Granting compassionate release despite receiving vaccine and recovering from Covid-19 noting breakthrough infections in Michigan and risk from Covid-19 reinfection).

**II.    Substandard and Harsh Conditions at Sheridan Increase the Risk to Mr. Cooke and Further Constitute Extraordinary and Compelling Reasons to Justify Compassionate Release.**

At the time of Mr. Cooke's sentencing, no one knew he would be assigned to Sheridan Correctional Facility in Oregon. He reported, as directed, on September 7, 2021, and has been incarcerated there since that time.

During points in this pandemic, prisoners in the United States were 550% more likely to contract Covid-19 were 300% more likely to die of the disease than those who were not incarcerated. Brendan Saloner, Kalind Parish & Julie Ward, et al. *Covid-19 Cases and Deaths in Federal and State Prisons,"* Journal of the American Medical Association (July 8, 2020). https://jamanetwork.com/journals/jama/fullarticle/2768249. Sheridan initially successfully managed the pandemic and avoided massive outbreaks of Covid-19. However, by late summer 2020, Sheridan's protective measures were breached and covid cases began rising rapidly. As long as Mr. Cooke remains at Sheridan, he remains at risk. *See*, Timothy Williams, Libby Seline & Rebecca Griesbach, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide,"* NYT, June 16, 2020. https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html (commenting on the speed of coronavirus outbreaks in prisons and jails). This is partly because, at Sheridan, Mr. Cooke is unable to follow the CDC's recommendations to protect himself from exposure to this highly-transmissible disease. *See, United States v. Gross*, No. 15-cr-769 (AJN), 2020 WL 1673244, at *1 (SDNY April 6, 2020) recognizing that "not only is [the defendant] at a higher risk of serious illness if he contracts Covid-19 due to his underlying health conditions, but he is also at a higher risk of contracting Covid-19 due to his incarceration"). While Mr. Cooke remains in close quarters with his fellow inmates, following CDC's guidance regarding precautions to avoid contracting Covid-19 is a practical impossibility. [5] Given the lockdowns and quarantines, the lack of access to facilities,

---

[5] Mr. Cooke reports that just this week, due to the need to fix a plumbing issue at Sheridan, the number of prisoners housed in his dormitory unit has doubled, from approximately 20 to approximately 40. Whatever limited ability he may have had to avoid contact with others who might be infected is immeasurably worsened with additional crowding and resulting increased risk of infection from Covid-19.

and the limited food options, Mr. Cooke has no chance of maintaining the diet and exercise regimen for self-care recommended by his physicians at Kaiser.

Since late August 2021, when Mr. Cooke was assigned to Sheridan, the facility has had a particularly poor track record in controlling Covid-19 outbreaks and in providing adequate prison services. The many deficiencies and resulting hardship and even death of a prisoner without receiving adequate medical care, led to an investigation of the facility that was undertaken on behalf of the Federal District Court in Oregon. (Exs. 8, 9, and 10). The investigator's report, filed September 17, 2021 (Ex. 11), showed documentation of lack of access to medical care (at 5, 7, 18-19), inadequate sanitation (at 6, 7), and inability to operate any group activities or programing (such as RDAP) or facilities (such as gym, law library, and educational rooms) that are generally available within the prison system. (at 16). The investigator noted the psychiatric impact of long term isolation and lock-downs and the resulting increased mental health problems among the prison population (at 18). *See also*, Fourth Declaration of Investigator Courtney Withecombe. (Ex. 12, filed October 8, 2021)(documenting examples of the conditions noted by the investigator in his report).

The facility's ongoing inability to cope with the Covid-19 pandemic is set forth in the Fifth Declaration filed by an investigator Courtney Withecombe on February 4, 2022:

> There is currently the largest outbreak of COVID that has ever occurred at the Sheridan facility. As of January 31, 2022, there were 216 active inmate cases per the government report. The national website provides a different number, likely due to reporting delays.

(Ex 13) at Para. 6.

In chart form, she documented the COVID-19 outbreaks at Sheridan as follows:



*Id.*  Currently, the facility is classified at Code Red on the BOP website, which means additional lockdowns are underway, decreased ability to be outside, and decreased contact with those outside the facility. *See*, BOP: COVID-19 Update  (last accessed May 19, 2022).

Additionally, the facility's efforts to deal with the outbreaks have had a harsh psychiatric impact of prisoners was detailed in the expert psychiatric report of Stuart Grassian, M.D., filed in connection with the investigation of Sheridan.  (Ex. 14).  Similarly, the lack of access to appropriate medical care at Sheridan is detailed in the expert medical report of Michael Puerini, M.D., who is an Advanced Certified Correctional Health Professional and who toured the facility as part of the investigative team. (Ex. 15).  Reports indicate that the lack of adequate access to medical care continues in 2022.  (Ex. 16).

Given the severity of the Defendant's underlying medical conditions, keeping the Defendant in the prison setting puts him not only at substantial risk of exposure to COVID-19

and/or its variants which could cause him great physical harm and possibly even death, but also at risk of receiving inadequate medical care for the ongoing chronic conditions with which he is afflicted.  Such an outcome is simply not proportional given all of the circumstances and the nature of his involvement in the offense conduct. For these reasons, modifying the Defendant's judgment by allowing him to serve the remainder of his sentence in home confinement would be appropriate given all of the circumstances.

Even if this Court concludes that Mr. Cooke does not have a medical condition that would counsel in favor of immediate release, the pandemic is still a relevant factor weighing in favor of a sentence reduction because "the risk of suffering severe health consequences if he contracts COVID-19, coupled to the harsh conditions imposed by the concomitant lockdowns and restrictions that are necessary to ensure the safety of the prisoners in Sheridan, mean that the actual severity of Mr. Cooke's sentence as a result of the COVID-19 outbreak exceeds what the Court could have anticipated at the time of sentencing." *United States v. Rodriguez*, 492 F. Supp. 3d 306, at *311 (SDNY September 20, 2020)("onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal"); *see also United States v. Lora*, 16-CR-44 (KPF), 2022 WL 1055749, at *5-6 (SDNY Apr. 8, 2022) ("[P]andemic-induced conditions of confinement *may* constitute 'extraordinary and compelling' circumstances warranting compassionate release, particularly for defendants who have (i) served long sentences and (ii) been detained for the entirety of the pandemic."); *United States v. Valencia Lopez*, 2022 WL 198604, at *3 (E.D.N.Y. Jan. 21, 2022) (recognizing that "detention during the pandemic has been more punitive than before" or "essentially the equivalent of either time and a half or two times what would ordinarily be served").  Reynolds v. United States, 2022 WL 1444167, at *4 (E.D.N.Y. May 6, 2022).

16

Notably, the entirety of Mr. Cooke's sentence has been served under the harsh conditions of the COVID-19 pandemic, at a facility that has been uniquely unable to successfully and humanely cope with the outbreaks since he arrived, leading to severely restrictive and harsh conditions according to investigators, as described in the declarations, expert reports, and investigation report attached hereto. Given the punitive nature of those conditions, it is fair to say that the time Mr. Cooke has served has fairly achieved the original sentence's purpose with regard to punishment and general deterrence. *See, United States v. Camper*, No. 13-CR-378 (AJN), 2020 WL 7647457, at *2 (S.D.N.Y. Sept. 2, 2020) (granting release where defendant had served "over half" of his sentence). *United States v. Francisco-Ovalle*, No. 18-CR-526 (AJN), 2022 WL 1094730, at *3 (S.D.N.Y. Apr. 12, 2022).

### III. Full Consideration of the Section 3553(a) Factors, the Court Should Reduce Mr. Cooke's Sentence to Time Served.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in Section 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(k). Here, those factors are met by a sentence reduction to time served.

In this case, the Defendant poses no danger to the community, nor does he pose a risk of reoffending. He is a first-time non-violent offender who led an otherwise exemplary life. He fully complied with all the terms and conditions of his pre-trial supervision. His prison record is spotless. Mr. Cooke meets the criteria for release set forth in the Memoranda from the Department of Justice and the Bureau of Prisons. Exs. 4-6. This Court already included 12 months of home confinement in his supervised release period, recognizing Mr. Cooke can serve a portion of his sentence in that environment presenting no danger to the community.

Mr. Cooke has access to a home that will allow him to shelter in place and practice social distancing mandated by public health experts. Furthermore, in Mr. Cooke's case, given his serious medical conditions, being able to practice prevention measures at home will be essential, especially given the immediate access to medical care if necessary. Mr. Cooke also has the ability to obtain full health insurance coverage for his medical conditions if his request is granted.

Allowing Mr. Cooke to serve out his sentence on home confinement will accomplish the statutory purposes of sentencing and will remain a deterrent to others who might consider engaging in the conduct at issue here. Consequently, modifying the Defendant's judgment by allowing him to serve the remainder of his sentence on home confinement would be consistent with the sentencing factors of 18 U.S.C. § 3553(a).

## Conclusion

Pursuant to 18 U.S.C. § 3582, a court may modify a term of imprisonment where "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). District courts across the country have recognized that ordering release and/or home confinement pursuant to 18 U.S.C. § 3582 is warranted when an inmate with specified underlying medical conditions is faced with incarceration during this COVID-19 health crisis. As the Court is well-aware, the coronavirus pandemic is a global crisis which is causing death and illness within the prison system due to the inherent impossibility of social distancing, the limited ability of prison officials to take preventative measures, and the difficulties in providing and receiving adequate medical treatment in confinement.

In this case, the Defendant meets all of the criteria necessary to be granted a modification of his sentence. His medical conditions are exactly those that the BOP itself has stated should result in his consideration for release under CDC guidelines. The Defendant presents no danger

to the community. Placing him at such high risk of serious bodily harm inside the prison setting is unwarranted.

Therefore, pursuant to the provisions of 18 U.S.C. § 3582(c)(1) as amended by the First Step Act (P.L. 115-391), the Defendant respectfully requests that this Court enter an Order modifying his sentence to allow him to serve the remainder of his incarcerative sentence I n home confinement.

Respectfully submitted,<br>
**PHILIP COOKE**<br>
By his attorney,<br>
<br>
<i>/s/ Susan G. Winkler</i><br>
Susan G. Winkler  (BBO No. 530682)<br>
WINKLER LAW LLC<br>
53 Lynch Avenue<br>
Dedham, MA 02026<br>
617-642-6671<br>
Winkler.susan@gmail.com

Dated:  May 20, 2022

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<i>/s/ Susan G. Winkler</i>
Susan G. Winkler

### RULE 7.1 CONFERENCE

I hereby certify I contacted counsel for the Government, AUSA Seth Kosto, by email on May 11, 2022, who does not assent to this motion.

<i>/s/ Susan G. Winkler</i>
Susan G. Winkler